709 So.2d 962 (1998)
David W. and Jennifer O'NEILL, Plaintiffs-Appellants,
v.
Newton THIBODEAUX and Bayou State Homes, Inc., et al., Defendants-Appellees.
No. 97-1065.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1998.
Writ Denied May 1, 1998.
*964 J.B. Jones, Jr., Cameron, Charles Schrumpf, Sulphur, for David W. and Jennifer O'Neill.
John Allen Jeansonne, Jr., G. Andrew Veazey, Lafayette, for Newton Thibodeaux, et al.
Peter Forrestt Caviness, Opelousas, for Liberty Corp. & Travelers Ins. Co.
Before THIBODEAUX, GREMILLION and PICKETT, JJ.
GREMILLION, Judge.
The plaintiffs, David and Jennifer O'Neill, appeal following a jury verdict finding neither the defendant, Newton Thibodeaux, negligent nor his building defective and a legal cause of the injuries sustained by David when he fell backwards over a railing. The third-party defendants, Liberty Corporation and its insurer, Travelers Insurance Company (Liberty), appeal the trial court's ruling awarding Thibodeaux and his insurer, Millers Mutual Fire Insurance (Thibodeaux), as third-party plaintiffs, indemnity and costs under the terms of a lease entered into between Thibodeaux and Magnolia Life Insurance Co., Liberty's predecessor.

FACTS
David suffered injuries to his cervical spine and shoulder on May 20, 1994, when he fell backwards over the railing of a handicap ramp, located at the rear of a building leased by his employer, Liberty, from Thibodeaux. It was the practice of the employees of Liberty, to sit or stand outside on the ramp while they smoked their cigarettes. The ramp runs from the back door of the building toward a parking lot located at the rear of the property. On the morning of May 20, prior to the beginning of a meeting, David was outside on the ramp smoking his cigarette. He was on the left side of the ramp behind the door, which opened to the left. He claimed that he was leaning against the ramp, with one foot propped up on the bottom rail of the railing. Other witnesses, however, claim that he was sitting completely on the top rail, with both feet on the bottom railing. Nevertheless, David fell backwards over the ramp shortly after another insurance agent, Truitt Meaux, exited the building through the door. He suffered injuries to his neck and left shoulder as a result of this fall.
David and his wife filed suit against Thibodeaux, the owner of the building, and Bayou State Homes, Inc., the builder, seeking damages under theories of negligence and strict liability.[1] Travelers Insurance Company, Liberty's insurer, intervened in the suit seeking reimbursement of workers' compensation benefits paid to David.[2] The O'Neills later amended their petition to add as defendants Millers Mutual Fire Insurance and Bituminous Casualty Company, Thibodeaux's and Bayou States' insurers respectively.
Thibodeaux filed a third-party demand against Liberty, based on an indemnity clause in the lease which required the lessee (Liberty) to defend, indemnify, and hold harmless the lessor (Thibodeaux) for claims of damages resulting from the negligence of the lessee or a defect in the property. Liberty answered this petition, asserting that the lease did not require it to defend or indemnify Thibodeaux for damages resulting from his own negligence and/or fault. They further alleged that the provision "caused by defects in the building" was ambiguous and should be construed against the drafter, Thibodeaux.
A jury trial was held on July 15-17, 1996. At its conclusion, the jury rendered a verdict in favor of Thibodeaux, finding him neither negligent nor his building defective. Following the jury trial, the trial court rendered reasons for judgment on the third-party claim in favor of Thibodeaux, finding that he *965 was entitled to indemnification in the full amount of attorney's fees from Liberty. A judgment containing the jury's verdict and the trial court's judgement was signed on November 15, 1996.
The O'Neills filed a motion for new trial on November 21, 1996, alleging that the trial judge should have recused himself from hearing the matter since he played cards regularly with Thibodeaux and one of his witnesses, and that the verdict was contrary to the law and evidence. The trial court ordered a recusation hearing, pursuant to La.Code Civ.P. art. 154, et seq, and stayed the O'Neills' motion for a new trial pending that hearing. Following the recusation hearing, Judge Robert Brinkman denied the motion as it pertained to the trial judge's recusal, finding no merit in the O'Neills' allegations, and transferred the matter back to the trial court. The trial court then denied their motion for a new trial, finding that the jury's verdict was not contrary to the law and evidence. The O'Neills appeal devolutively from this judgment. Liberty appeals suspensively from the trial court's judgment in favor of Thibodeaux.

ISSUES
The O'Neills specify three errors on appeal:
1. The trial court erred in refusing to allow plaintiff's evidence of subsequent repairs of the railing, while allowing defendant's claim that no repairs occurred.
2. The [jury] erred in finding that the railing was not defective and that it was not a substantial cause of the damages to plaintiff.
3. The trial court erred in not recusing himself, because of the appearance of impropriety and not granting a new trial.
In addition to responding conversely to the three errors assigned by the O'Neills, Liberty claims that the trial court erred in awarding Thibodeaux indemnification and costs under the terms of the lease. Thibodeaux answered this appeal seeking additional attorney's fees for work performed on appeal. We will address the O'Neills' assignments of error first. Since the issue concerning the trial court's failure to recuse himself from hearing the matter could ultimately result in a reversal and remand of the matter, we will consider that assignment first.

RECUSAL
In their third assignment of error, the O'Neills argue that the trial court erred by not recusing himself due to the appearance of impropriety caused by him playing cards regularly with Thibodeaux and one of his employees, Alvin Manuel. Both Thibodeaux and Liberty argue that no error resulted from the trial judge's failure to recuse himself from the matter. Thibodeaux claims that the O'Neills waived their right to recusal since they failed to raise it prior to the signing of the judgment, pursuant to La. Code Civ.P. art. 154. He further argues that there is no valid basis for recusal since this was a jury trial, and the O'Neills were given the opportunity to file a motion for recusal prior to trial when the trial judge informed them of his relationship with Thibodeaux. In addition, Liberty argues that La.Code Civ.P. art. 151, which lists the grounds for recusal, is the "sole and exclusive grounds for recusal of a Judge." Because the O'Neills' basis for recusal does not comport with any of the grounds listed in Article 151, Liberty asks that this assignment of error be dismissed.
Article 151 of the Louisiana Code of Civil Procedure lists the grounds for the recusation of a judge:
A. A judge of any court, trial or appellate, shall be recused when he is a witness in the cause.
B. A judge of any court, trial or appellate, may be recused when he:
(1) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(2) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and *966 in this case the employment shall be disclosed to each party in the cause;
(3) Has performed a judicial act in the cause in another court;
(4) Is the spouse of a party, or of an attorney employed in the cause; or is related to a party, or to the spouse of a party, within the fourth degree; or is related to an attorney employed in the cause; or to the spouse of the attorney, within the second degree; or
(5) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.
La.Code Civ.P. art. 154 provides the procedure to follow when seeking the recusation of a judge at the district court level:
A party desiring to recuse a judge of a district court shall file a written motion therefor assigning the ground for recusation. This motion shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after these facts are discovered, but prior to judgment. If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion to another judge or a judge ad hoc, as provided in Articles 155 and 156, for a hearing.
In addition to the requirement of a written pre-trial or pre-judgment motion for recusal, previous cases have held that judges may only be recused pursuant to one of the grounds enumerated in Article 151. Matter of Anderson, 496 So.2d 568 (La.App. 1 Cir. 1986); Love v. Baden, 478 So.2d 1008 (La. App. 3 Cir.1985). However, the recent Louisiana Supreme Court case of In re Lemoine, 96-2116, pp. 2-4 (4/4/97); 692 So.2d 358, 359-360, on rehearing stated that:
A judge's clear violation of a statute is misconduct, because it is a judge violating the law, and such disobedience or disrespect for the law, which his very oath commands that he support, constitutes "willful misconduct relating this official duty," under Art. V, § 25(C) of the Constitution.[[3]] Such a statutory violation would also constitute an ethical breach under Canon 2 of the Code of Judicial Conduct.[[4]] At the time of Judge Lemoine's violation of C.Cr.P. art. 671, Canon 2, titled "A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities," provided in part:
A. judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. (Emphasis supplied).
On the other hand, violation of law is not a necessary prerequisite for finding misconduct warranting judicial discipline. Rather, even absent deviation from some statutory provision (or for that matter, absent the violation of a canon of the Code of Judicial Conduct), a judge's misconduct may be so serious as to constitute that type of "willful misconduct relating to his official duty, willful and persistent failure to perform his duty, [or] persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute ..." and warrant discipline under Art. V, § 25(C).
From this we see that the absence of a statute ordering a judge to recuse himself, and the absence of a pertinent ethical canon, does not insulate that judge from discipline for not recusing himself in a civil case, contrary to what we said in our original opinion. For instance, C.C. P. art. *967 151(B) may not recite, as does C.Cr.P. art. 671, that a judge "shall be recused" for any of the enumerated grounds, but his conduct in sitting in such a case may well constitute conduct that brings the office into disrepute, and be of such a serious nature as to warrant discipline. Our comment above is applicable to what is involved in this case, C.C.P. art. 151(B)(1) a judge's association with an attorney during the attorney's employment in the cause, if such misconduct is serious and so improper as to constitute "willful misconduct relating to his official duty, willful and persistent failure to perform his duty, [or] persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute."
Of course, association with an attorney in the cause need not necessarily be misconduct that brings the judicial office into disrepute. For instance, the association may be of a non-legal sort and not otherwise sufficiently offensive as to bring the judicial office into disrepute. Or the parties may choose to have the judge continue in the case, knowing full well of the association. In these situations, coupled with the judge's obligation to decide cases properly brought before him, a reasonable reviewing court might well conclude that there has not been misconduct at all, or that there has not been misconduct so serious to warrant a finding that he has brought the judiciary into disrepute by being associated with an attorney in a case before him.
Our conclusion, therefore, is that a judge's failure to recuse himself in a civil case may, under certain circumstances, but need not in all instances, constitute the type of punishable misconduct envisioned by the constitutional prohibitions outlined above. And further, by violating the Constitution, such a serious failure to recuse may constitute a breach of Canon 2, which states that judges should "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and perhaps Canon 1 as well,[[5]] with its general exhortation to preserve the integrity of the judiciary through high standards of conduct.
(Footnotes omitted and added).
Certainly, as a result of In re Lemoine, in those instances where the failure of a trial judge to recuse himself could result in punishable misconduct, the trial judge should recuse himself even if pursuant to a ground not listed under Article 151. Conduct rises to punishable misconduct if the conduct in question is so serious and improper that it constitutes "willful misconduct relating to his official duty, willful and persistent failure to perform his duty, [or] persistent and public conduct prejudicial to the administration of justice that bring the judicial office into disrepute," Id. at 360.
Initially, we find that the O'Neills failed to file a written motion of recusal prior to the signing of the judgement, as required by Article 154. We further find that the motion was not timely filed upon discovery of the possible grounds for recusation of the trial judge. Nevertheless, we find no error in the trial judge's failure to recuse himself from this matter. At the hearing on the motion to recuse, all of the parties admitted that the trial judge informed them prior to the trial that he was well acquainted with Thibodeaux. Counsel for Thibodeaux and Liberty also recalled the trial judge informing them that he had represented Thibodeaux in the past, and that he gave them the opportunity to raise an objection at that time. The trial judge also testified that he informed the parties that he knew Thibodeaux well and had represented him ten or fifteen years previously. He further testified that he played cards at suppers organized by Thibodeaux at his camp approximately four or five times a year. He estimated that he played cards with Thibodeaux two or three *968 months prior to the trial and one month after the trial. The trial judge further testified that he played cards weekly with Manuel. He stated that he was unaware that Manuel was a witness in the matter prior to him testifying. In finding no merit in the O'Neills' request to recuse the trial judge, the recusation trial court held that it did not fit any of the grounds for recusal under Article 151, nor was there any evidence in the record to suggest that the trial judge was not impartial.
There was no error in this ruling. The fact that the trial judge plays cards with Thibodeaux several times a year is not conduct that falls under Article 151, nor is it so serious that it warrants a finding that he brought the judiciary into disrepute pursuant to Art. V, § 25(C). All of the parties knew, prior to trial, that the trial judge was well acquainted with Thibodeaux. The parties obviously decided, despite knowing of the acquaintance, that the trial judge could render a fair and impartial decision in this matter. He did. Whether they knew the trial judge played cards periodically with Thibodeaux should not have made a greater impact on their decision. That fact was simply a part of their relationship. Trial judges are not required to live their lives in a vacuum, cut off from society in order to prevent instances such as this from occurring. It would be impossible for a trial judge to remain aloof in small towns such as Eunice, where most people know each other, especially the judges. If we hold that the trial judge should have recused himself in this instance, all trial judges will be hard pressed to know when he/she should hear a matter or should be recused. This would exact a high price, especially in those smaller judicial districts which have only one or two trial judges. Judges are not required to disassociate themselves from friends and acquaintances upon taking the bench. Their obligation is to avoid impropriety and the appearance thereof in their dealings. A judge is required to disclose those instances and relationships in which he/she could not be impartial, those which are improper under the law, as well as those that appear to be. If we could find fault with the trial judge in the instant case, it would be that he did not make a record of his disclosure. However, the trial judge did make such a disclosure prior to trial, albeit in chambers. At that time, the plaintiffs had the option to ask for the trial judge's recusal, explore the relationship on the record, or accept the trial judge for the duration. Plaintiffs were obviously content with the trial judge's disclosure and their decision until the trial concluded unfavorably for them. We find that the trial judge's actions were appropriate relative to his disclosure and that he acted impartially in this matter. Thus, we find no merit in this assignment of error.

SUBSEQUENT REMEDIAL MEASURES
In their first assignment of error, the O'Neills argue that the trial court erred in refusing to allow them to present evidence of subsequent repairs made to the railing of the ramp, while allowing Thibodeaux to present evidence that no such repairs occurred. Prior to the jury trial, the O'Neills filed a motion in limine seeking to introduce evidence of subsequent remedial measures. A hearing was held on the issue, following which the trial court denied the O'Neills' motion. The trial court, relying on La.Code Evid. art. 407, held that no evidence of subsequent remedial measures would be allowed into evidence, "except that the parties [would] be allowed to establish that generally before and/or after this accident repairs were made by Mr. Thibodeaux when requested by the lessee. The evidence in this regards shall not make specific reference to the instrumentality involved in this accident, i.e. the handrail." A Stipulation of Proffer was offered into evidence by the parties during the trial.
On appeal, the O'Neills claim that due to the trial court's ruling Thibodeaux and Liberty were able to present testimony through their witnesses that the rail never presented a problem nor was anything ever done to it. They specifically point to the testimony of Manuel, Thibodeaux's maintenance man, who stated on cross-examination that prior to May 1994, he was never requested to repair the rail nor saw anything wrong with it. The O'Neills argue that because their witnesses testified that the rail was unstable and unattached to the wall prior to the accident and *969 they were prevented from introducing evidence concerning repairs made subsequent to the accident, the jury "was left with the decision with who was telling the truth."
La.Code Evid. art. 407 provides:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.
The trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal absent an abuse of that discretion. Maddox v. Omni Drilling Corp., 96-1673 (La.App. 3 Cir. 8/6/97); 698 So.2d 1022. After reviewing the record, we find no error in the trial court's ruling with regards to the introduction of evidence of the subsequent remedial measures. The O'Neills sought to introduce the evidence in order to prove negligence on the part of Thibodeaux. This violates the very heart of La.Code Evid. art. 407, that is, to encourage people to take, or at least not discourage them from taking steps in furtherance of added safety. A repairer will often act from an abundance of caution and not through consciousness of prior fault. La.Code Evid. art. 407, 1997 Authors' Notes. For those reasons, unless the subsequent repairs may be introduced under the exceptions in Article 407, they are simply not relevant. We disagree with the O'Neills' contention that Thibodeaux was able to present evidence that "there was never ever anything done to the rail and that it was never a problem." We agree that the jury was left with the decision of deciding who was telling the truth. However, since it is the province of the jury to decide just that question through its findings of fact, and both parties were able to present relevant evidence relating to their version of the facts, we find no abuse of discretion by the trial court and decline to upset its ruling excluding this evidence. This assignment of error is without merit.

JURY'S FINDING OF FACT
In their final assignment of error, the O'Neills claim that the jury erred in finding that the railing of the handicap ramp was not defective and was not a substantial cause of David's damages. The O'Neills sought recovery of damages from Thibodeaux under theories of negligence[6] and strict liability.[7] In its verdict, the jury found neither Thibodeaux guilty of negligence nor the building he leased to Liberty defective. These are findings of fact, which we will not overturn in the absence of manifest error, or a determination that they are clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Under the appellate standard of review, we will only reverse the findings of the jury if, after reviewing the record in its entirety, we find that a reasonable factual basis does not exist for those findings, and the record establishes that they are clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La. 1993). The court in Stobart went on to state:
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not *970 credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
Id. at 882-883 (citations omitted).

Evidence Presented by the O'Neills
David testified that he was partially sitting on the top railing, with his left foot on the second rail and his right foot on the floor of the ramp. When Meaux came out of the door, David stated that Meaux threw his hands up in a gesture towards him. As he reached up to catch the door, David said he leaned back into the railing. At that point, he stated that he felt the rail give, causing him to fall backwards. In an effort to regain his balance, he moved his arms in a circular motion. He reached towards Meaux, but missed him. When he realized that he was going to fall, David testified that he tried to spin off and catch himself before he hit the ground.
David testified that the rail did not feel wobbly prior to the accident, but, afterwards, he found that there were either insufficient or no nails connecting it to the side of the building. When he pushed on the railing, he stated that it moved approximately eight and one/half inches out from its original location. He further stated that the rail appeared old and in poor condition. David testified that he did not remember telling the Acadian Ambulance attendants that he lost his balance and fell backwards over the railing. He also testified that he was unaware of the rule that Liberty's employees were not supposed to sit on the rail.
Meaux testified that David was sitting on the edge of the railing behind the door at the time of the accident. He stated that when he walked out the door, he threw his hands up in a gesture and that David answered with the same gesture. Next, he saw David making circular motions with his arms. Meaux testified that he thought David was fooling around, then he saw his expression change. When he realized David was falling, he tried to grab him but missed. Meaux testified that he did not know if both of David's feet were on the bottom rail or on the floor, but he did state that the rail was not attached to the building. Meaux further testified that he and David were not engaged in horseplay when the accident occurred. He testified that the district manager told them not to sit on the rail in meetings and while they were outside sitting on the rail, but he was unsure if David was present any of those times. Meaux admitted that after the accident the employees continued sitting on the rail.
Randall Broussard, a licensed architect, opined that the railing did not meet the requirements of the building code, which requires it to resist a force of two hundred pounds at any point along the rail, and from any direction. Based on photographs taken shortly after the accident, Broussard testified that the railing failed because it moved out of position approximately three or more inches. He said that this could have caused David to lose his balance and fall. When he examined the rail several months prior to the trial in July 1996, Broussard testified that he found five nails, either sixteen or twenty penny nails, fastening the vertical of the rail to the horizontal stringer on the ramp area. Three of the nails appeared newer, while the other two were heavily oxidized or rusty. Thus, he felt that only two nails were connecting the vertical of the railing to the handicap ramp at the time of the accident. Broussard found no evidence of nails connecting the vertical or *971 the top board of the rail to the wall of the building, nor did he see any marks left from nails pulled out of the building. With only two nails connecting the verticle to the ramp, Broussard estimated that there was only eighty pounds of holding force at the top of the railing, instead of the two hundred pounds required by the building code, if the nails were sixteen penny nails and the rail was thirty-two inches tall. He testified that the holding force of the top of the rail could have been increased by putting more nails into the vertical members of the railing or connecting it with a different type of fastener, such as a bolt or a threaded screw which has greater holding capacity than a nail. Broussard also stated that the rail would have been more likely to fail if David leaned against it, instead of sitting on it, because more force would have been exerted horizontally on the rail than straight down.
Broussard stated that the rail's condition could also have lead to its failure, since it was neither painted nor sealed. Ultraviolet deterioration would have occurred in the fibers of the wood due to the hot, cold, and wet conditions the wood was exposed to. As it weathered, the holding capacity of the rail would have decreased, which could have been further weakened by it being sat on daily by Liberty's employees.
Broussard explained that inspection by the state fire marshal would not have ensured that the rail met the strength requirements of the building code. He stated that he had never seen a fire marshal perform a strength inspection in his twenty-four years of attending inspections. He said that the fire marshal would only have been required to inspect the ramp with regards to the exit life safety requirements, and check that handrail met the height requirements. Broussard opined that the fire marshal would not have commented on the strength of the rail's connections unless the rail was falling off.
On cross-examination, Broussard said that David told him that he was leaning against the rail with both feet on the ground when the accident occurred. However, he stated that David's position on the rail was insignificant since it had no relevance to the ultimate question of whether the rail met the requirements of the building code. Although the purpose of the rail is to keep people on the ramp, Broussard testified that, as an architect, he has to assume that people are going to sit on a rail when he designs it. This, he stated, is reflected in the building code's requirement that the rail resist the force of two hundred pounds at any point and in any direction.
Manuel, Thibodeaux's maintenance man, testified that he would be notified of repairs required on Liberty's building when Elizabeth Dupre, Thibodeaux's secretary, received a complaint. He admitted performing maintenance work on the building in the past, but stated that he had never been required to change any boards on the railing of the handicap ramp, nor had he ever nailed the railing into the wall or performed work on it prior to May 1994. Manuel stated that when he had worked around the back door, he never saw anything wrong with the railing, although he admitted that he never pushed, sat, or leaned against it.
Lee Ray Johnson, Liberty's sales manager at the time of the accident, had renegotiated Magnolia Life's lease with Thibodeaux in 1992. He testified that he told Thibodeaux then that the whole ramp was unstable. Although he was on vacation when David's accident occurred on Friday, he saw the rail leaning over the next Monday when he walked David out to his car. Johnson testified that he assumed the rail was nailed to the building, however, he admitted not seeing any nails. On cross-examination, he testified that he saw nails in the rail when it was leaning over. He had testified in his deposition that he saw two or three nails at the top of the railing. Johnson stated that he had no memory of telling the employees not to sit on the ramp, nor did he hear Ervin LaFleur do so.

Evidence Presented by Thibodeaux
Becky Reed was outside prior to the accident, but went inside the building shortly before it occurred. While she was outside, she said that David was sitting on the rail, behind the door, with both of his feet up on the second rail. She said that someone else was going out the door the same time that she was going through it, but the door never *972 touched David. Reed stated that she sat on the rail prior to the accident, but never noticed that it was loose. After the accident, she testified that the rail was loose from David hanging onto it with his legs before falling. She further stated that the rail was nailed to the building. However, she admitted that she never really noticed how the rail was attached to the building. Reed testified that Mary Menard contacted Thibodeaux and told him that the nails were out of the rail and that it needed to be fixed. Finally, she testified that they were told by Ervin LaFleur not to sit on the rail.
Doris Menier testified that she was outside smoking prior to the meeting, but went inside three to four minutes before the accident. While she was outside, she stated that David was sitting on the rail with both feet off of the ground. Menier testified that she never looked at the rail after the accident, nor did she ever hear that it was loose. She stated that she thought the rail was nailed into the side of the building, but admitted that she never really looked at it. Menier said that they were told several times by Ervin LaFleur and Johnson not to sit on the rail. She thought that David was present when they were told.
Mary Menard was inside the office when the accident happened. She stated that the rail was nailed to the building prior to the accident, and that Ervin LaFleur told the employees not to sit on it. On cross-examination, Menard testified that the rail was secured to the building, however, she was unsure how.
Ervin LaFleur testified that he was the district manager for Liberty Life's Eunice district at the time of David's accident. He said that he was in the office when the accident occurred. Afterwards, he checked the rail and found it stable. However, LaFleur recalled asking one of the secretaries to call Thibodeaux about having the rail fixed. When asked if the rail would lean over as was depicted in the photographs, LaFleur responded that he did not imagine it would do so. He also testified that he did not check the rail for nails after the accident. He stated that Liberty had a rule that no one was to sit on the rail. He thought that everyone should have known about the rule because he announced it at meetings and posted it on the bulletin board.
Angela LaFleur testified that she was standing next to David prior to the accident. She said he was sitting on the rail behind the door, and that he had both feet off of the ramp. LaFleur testified that when Meaux came out the door, he laughingly raised his hands towards David, as though to shake hands. She said that David made the same gesture towards Meaux, then, as he lost his balance, he moved his arms in a circular motion. Meaux grabbed David's ankle and foot as he fell, causing his shoe to come off. LaFleur testified that she did not see the ramp collapse or fall away. After the accident, she stated that the ramp was in the same position, that she bent over it and did not recall it shaking. Prior to the accident, LaFleur testified that the ramp was loose, but it never collapsed or fell. She stated that she had sat on it before the accident and found it to be sturdy. LaFleur further testified that the employees were told by the district manager and the sales manager not to sit on the rail. She believed David was present when they were given this information.
Elizabeth Dupre manages apartments and some individual buildings for Thibodeaux. She testified that, prior to the accident, there were no complaints from Liberty pertaining to the handicap ramp.
Chip Thibodeaux, Thibodeaux's son, manages the rental property for his father. He has an architectural degree from Louisiana State University, but is not licensed to practice commercial architecture. Chip testified that he drafted the plans for the building from plans given to him by Magnolia Life's manager. He was present when both the fire marshal and the city inspector inspected the building, and stated that neither found anything wrong with the handicap ramp or railing. However, he stated that the fire marshal did not use a mechanical device to check the strength of the rail, other than putting his own weight on the rail. Chip testified that he did general inspections of the building every couple of months, during which he never discovered a problem with *973 the ramp prior to the accident. He stated that someone had slipped on the handicap ramp prior to 1994, but he never noticed a problem with either the ramp or the railing when he inspected them following that accident. He did not know if the rail was nailed directly to the building.
After reviewing the record in its entirety, we find that the jury was presented with two views of evidence. The O'Neills presented evidence that the rail failed to meet the requirements of the building code, in that it was not fastened to the building correctly causing David to fall when it gave way. Thibodeaux's evidence presented the view that the rail was not defective and David's fall was the result of his own negligence. The evidence showed that he was told not to sit on the rail, but while sitting on the rail he lost his balance, and fell backwards. Although several of Thibodeaux's witnesses were outside when the accident happened, and there was conflicting testimony pertaining to whether the railing was stable following the accident and whether it was nailed to the building, it was in the province of the jury to decide which testimony to believe. Consequently, we find that the verdict rendered by the jury was reasonable. Finding no merit in this assignment of error, we affirm the trial court's judgment.

LIBERTY
On appeal, Liberty argues that the trial court erred in granting Thibodeaux indemnity and costs of defense under the terms of the lease executed by him and Magnolia Life. The original lease was executed in 1987, and had a term of five years. In 1992, Thibodeaux and Magnolia Life renegotiated the lease, changing only the monthly rental amount and the term of the lease. Liberty argues that the trial court erred in granting Thibodeaux indemnity and costs because the terms of the lease are ambiguous as to who has responsibility for the condition of the premises. It further argues that since the O'Neills sued Thibodeaux for his own negligence, as well as for defects in the building, it should not be required to indemnify him for costs which pertained to his defense of his own negligence.
The pertinent portions of the lease at issue are as follows:
Lessor will maintain the property and make all necessary repairs to the roof, walls, foundation of the property, and other such repairs required to maintain the property in a habitable condition, broken glass, repairs to plumbing fixtures, outlets and drains, and electrical equipment, but in no event shall Lessor be required to make any repairs occasioned by the Lessee's improper, careless or negligent use of the property. Lessee agrees to report any damage to the leased premises within twenty-four (24) hours after occurrence.
Lessee assumes responsibility for the condition of the leased premises, and Lessor shall not be liable to Lessee, or anyone on or adjacent to the property who derives his right to be thereon from Lessee, for any damage to person or property caused by an act, omission or negligence of Lessee or the person it is responsible for, or caused by any defect in the property, including leaking roof, bursting pipes, etc., and Lessee agrees to defend, indemnify and hold Lessor harmless from all claims for any such damage, including the costs of defense of such claims.
In finding that Thibodeaux was entitled to full indemnification of attorney's fees expended in his defense of this suit, the trial court found that Liberty refused to tender a defense to Thibodeaux under either theory of recovery. Thus, it held that it would not be appropriate for Liberty to "reap any rewards as a result of the work efforts of its attorney, even though those efforts may have in some fashion or another inured to the benefit of Mr. Thibodeaux and his insurer." With regard to Liberty's argument concerning the ambiguity of the lease provisions, the trial court held that, under the terms of the lease, the parties intended that Thibodeaux would be responsible for the "basic/major repairs," but that Liberty agreed to indemnify him for any litigation related to the leased premises. Accordingly, the trial court awarded Thibodeaux indemnification in the amount of $26,153.21.
La.R.S. 9:3221 provides:

*974 The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.
In Stelly v. Overhead Door Co. of Baton Rouge, 94-0569, p. 9 (La.12/8/94); 646 So.2d 905, 913, the supreme court stated:
Normally, the owner of a building remains liable for the condition of the building, and for any resulting injuries arising therefrom, even when it is leased. See LSA-C.C. arts. 660, 2317, 2322 and 2695. See also Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261 (La.1981). However, there is an exception to this rule of law. A lessee may contractually assume the owner's responsibilities for the condition of the leased premises, including liability for any injuries resulting from defects in the premises pursuant to LSA-R.S. 9:32[2]1.
(Footnote omitted).
Thus, in order for an owner-lessor to escape liability under a lease pursuant to La.R.S. 9:3221, he must prove that the lessee assumed responsibility for the condition of the premises under the contract of lease, that the injury must have occurred either to the lessee or anyone on the premises with the permission of the lessee, and that he did not know nor should have known of the defect. Wallace v. Helmer Directional Drilling, Inc., 93-901 (La.App. 3 Cir. 7/13/94); 641 So.2d 624.
In this instance, Thibodeaux and Magnolia Life entered into a contract of lease. That contract is the law between Thibodeaux and Liberty (as Magnolia Life's successor in interest). Id. The language of the lease is clear. The parties intended for Thibodeaux to maintain the property in a habitable condition by performing "basic/major repairs," as found by the trial court, and for Liberty to assume responsibility for the condition of the property and "defend, indemnify and hold [Thibodeaux] harmless from all such claims for any such damage, including the costs of defense of such claims." The trial court obviously concluded that the terms of the contract were not ambiguous, and that Liberty assumed responsibility for the condition of the building pursuant to La.R.S. 9:3221. While the ultimate determination of the parties' intent concerning a contract is a mixed question of law and fact, the determination of the parties' subjective intent is a question of fact which will not be reversed absent manifest error. King v. Strohe, 95-656 (La.App. 3 Cir. 5/8/96); 673 So.2d 1329. We detect no error in the trial court's finding of fact.
With regard to Liberty's argument that it was not liable to Thibodeaux for indemnification and costs of defense for damages arising from his own negligence, the trial court found that Liberty failed and refused to tender a defense to him under either theory. As in insurance cases, we must look to the O'Neills' petition to determine whether Liberty was required to defend Thibodeaux. Sullen v. Missouri Pac. R.R. Co., 750 F.2d 428 (5th Cir.1985); Young Oil Co. of Louisiana, Inc., v. Durbin, 412 So.2d 620 (La.App. 2 Cir.1982). The O'Neills sued Thibodeaux under both negligence and strict liability. The contract of lease provided that Liberty agreed to defend, indemnify, and hold Thibodeaux harmless from all claims for damages, including the costs of defense. The "damage" provided for in the contract specifically included that caused by "any defect in the property." Thus, according to the terms of the contract, Liberty was required to defend Thibodeaux against the O'Neills' allegation that the building was defective. This Liberty refused to do. Although Liberty is not required to indemnify Thibodeaux for his own acts of negligence absent an explicit provision in the act of lease, we cannot say that the trial court erred in awarding Thibodeaux indemnification. Perkins v. J.W. Contractors, Inc., 586 So.2d 719 (La.App. 3 Cir. 1991), writ denied, 590 So.2d 591 (La.1992). Since Liberty was required to provide Thibodeaux with a defense pursuant to the O'Neills' claim under strict liability, we will not reduce the amount awarded by the trial court. We can find nothing in the record which would have allowed the trial court to *975 distinguish between the costs of defending the negligence claim from the costs of defending the strict liability claim if, in fact, there was a distinction. Thus, we cannot say that the trial court erred in awarding Thibodeaux indemnification and costs of defense. The trial court's judgment is affirmed and Liberty's assignment of error is dismissed.

ANSWER TO APPEAL
Thibodeaux answered Liberty's petition for appeal seeking additional attorney's fees for work done on appeal. An appellee's request for additional attorney's fees will be granted if the appellant appeals but obtains no relief, the appeal requires more work from the appellee, and the appellee requests an increase in attorney's fees in accordance with proper appellate procedure. Riser v. Acadiana Limousine Serv., Inc., 96-1687 (La.App. 3 Cir. 4/30/97); 693 So.2d 330, writ denied, 97-1420 (La.9/19/97); 701 So.2d 173. In this case, all of the requirements for awarding additional attorney's fees were met. Counsel for Thibodeaux prepared written briefs and appeared at and presented oral argument. Consequentially, we will award an additional amount of $3,000.00 for the work counsel for Thibodeaux performed on appeal.

CONCLUSION
For the above stated reasons, the judgment of the trial court is amended to increase the attorney's fees awarded to the defendant-appellee, Newton Thibodeaux, from $26,153.21 to $29,153.21. The judgment is affirmed in all other respects. The costs of this matter are assessed equally between the plaintiffs-appellants, David and Jennifer O'Neill, and the defendant-appellant/appellee, Liberty Corporation.
AFFIRMED AS AMENDED.
NOTES
[1] Bayou State Homes, Inc. and its insurer, Bituminous Casualty Corporation were later dismissed from this suit by the plaintiffs because Bayou State Homes did not construct the building.
[2] This action was later dismissed following a compromise between the parties.
[3] Article V, § 25(C) provides in pertinent part:

On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
[4] Canon 2 of the Code of Judicial Conduct provides in pertinent part:

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
[5] Canon 1 provides:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provision of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
[6] La.Civ.Code art. 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."
[7] La.Civ.Code art. 2322 provides that the "owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."