753 So.2d 1228 (2000)
Inquiry Concerning a Judge, No. 96-30, re Richard H. FRANK.
No. SC92630.
Supreme Court of Florida.
February 17, 2000.
*1229 Honorable Frank N. Kaney, Chairman, and John Beranek, Counsel to the Hearing Panel, Florida Judicial Qualifications Commission, Tallahassee, Florida; and Steven A. Werber and John S. Mills, Special Counsel, Jacksonville, Florida, for Petitioner.
*1230 Michael C. Addison, Tampa, Florida, for Respondent.
PER CURIAM.
We review the recommendation of the Judicial Qualifications Commission (JQC) that Judge Richard H. Frank,[1] retired Chief Judge of the Second District Court of Appeal, be reprimanded for violating Canons 1, 2, and 3 of the Code of Judicial Conduct. We have jurisdiction. See art. V, § 12, Fla. Const. As explained below, we disapprove the JQC's findings and conclusions as to the first statement[2] comprising Count I, but approve as to the second statement[3] in Count I; approve as to Count II; disapprove as to Count III; and issue a public reprimand and announce the policy that reprimands for such serious conduct should be delivered in person. We direct that Judge Frank pay the costs of these proceedings, and remand this cause to the JQC for a determination of the amount of such costs. See art. V, § 12(c)(2), 12(j); see also In re Hapner, 737 So.2d 1075 (Fla.1999).
On March 20, 1998, the Investigative Panel of the JQC filed in this Court a four-count "Notice of Formal Proceedings" against Judge Frank, charging him with violating Canons 1, 2, and 3 of the Code of Judicial Conduct. The allegations set forth in the first three counts of the notice related, at least tangentially, to Judge Frank's involvement in matters surrounding his daughter Stacy Frank's divorce from her husband, Mark Straley, both being members of The Florida Bar (the Bar). The allegations contained in the fourth count of the notice specifically related to a telephone conversation between Judge Frank and Kurt Weber, whose son Craig was, at the time of the telephone conversation, married to one of Judge Frank's other daughters, Hillary. The specifics of these counts are summarized below.
In Count I of the notice, the Investigative Panel first alleged that shortly before September 6, 1993, a St. Petersburg Times newspaper reporter, Bruce Vielmetti, interviewed Judge Frank concerning the then-ongoing marital dissolution proceeding involving Stacey Frank and Mark Straley. During this interview, Judge Frank allegedly made false or misleading statements which were included in an article written by Mr. Vielmetti that was published in the September 6, 1993, edition of The St. Petersburg Times. The Investigative Panel then alleged that Judge Frank made similar false or misleading statements, under oath, during a hearing before a grievance committee of the Bar; Judge Frank had filed a complaint with the Bar against Mark Straley, in part based on Mr. Straley's alleged instigation of the Vielmetti article. The general nature of these allegedly false and misleading statements made by Judge Frank was that he had "studiously stayed away" from the divorce litigation involving Stacy Frank and Mark Straley and that he "never discussed" with Judge Chris Altenbernd, a colleague on the Second District, the representation of Stacy Frank by George Vaka, an appellate lawyer and former law partner of Judge Altenbernd.
In Count II, the Investigative Panel alleged that Judge Frank's relationship to Mr. Vaka might have caused parties opposing Mr. Vaka in appeals before the Second District to reasonably question Judge Frank's impartiality, but that Judge Frank (1) did not recuse himself from cases in which Mr. Vaka appeared as counsel; *1231 and (2) did not disclose to counsel opposing Mr. Vaka that Mr. Vaka was representing Stacy Frank.
In Count III, the Investigative Panel alleged that Judge Frank improperly interfered with the Bar grievance proceeding against Mr. Straley by exerting his position as a judge in a manner unbecoming of his office. Specifically, the Investigative Panel alleged that after the referee in the grievance matter granted summary judgment in Mr. Straley's favor on a majority of the grievance, and after the Bar dismissed the remainder of that grievance, Judge Frank improperly complained about the competence of Bar counsel prosecuting the grievance and caused such counsel's job to be placed in jeopardy.
Finally, the Investigative Panel alleged in Count IV of the notice that during the divorce proceedings which involved his daughter, Hillary Frank Weber, and his son-in-law, Craig Weber, Judge Frank telephoned Mr. Weber's father and threatened to use his authority as a judge to have Craig Weber arrested or committed to a psychiatric facility.
On April 13, 1998, Judge Frank, through counsel, filed an answer to the Investigative Panel's formal notice. In his answer, Judge Frank generally agreed to many of the facts asserted in the notice, but he specifically denied the factual allegations relating to the content of his telephone conversation with Kurt Weber. Overall, Judge Frank argued that the facts to which he agreed failed to establish that he had breached the Code of Judicial Conduct.
Thereafter, the Hearing Panel of the JQC conducted a hearing on Judge Frank's case. After conducting the two-day hearing, the Hearing Panel filed its findings, conclusions, and recommendations in this Court. The Hearing Panel's specific findings as to each count provide the following:
COUNT I-Grievance Testimony
The Commission finds that Count I has been proven true in part. The Count asserts that Judge Frank made statements to a St. Petersburg Times reporter, that he filed a grievance complaint against Straley and that he testified falsely before the grievance committee. The Commission concludes that the important and essential allegations here, as stated in the title of Count I, is the sworn Grievance Testimony. Thus, no specific findings are made in regard to the alleged unsworn statements made to the reporter nor the assertion that Mr. Straley had "inspired" adverse comments in the newspaper.
The Commission does conclude that the testimony before the Grievance Committee was untrue and misleading. Judge Frank stated: "I have studiously stayed away from Stacy's divorce litigation" and "I never discussed with Chris Altenbernd the representation of my daughter, to the best of my knowledge." As a matter of fact, based on the clear and convincing evidence, the Commission concludes that Judge Frank had not stayed away from the divorce litigation and that, in fact, he had discussed the representation of his daughter with Judge Chris Altenbernd. Even though Stacy Frank's name may not have been expressly mentioned in this conversation between Judge Altenbernd and Judge Frank, we conclude that both fully understood that the appellate representation of Stacy Frank was being discussed and as a result of that conversation, Judge Altenbernd contacted Mr. Vaka and asked him whether he would be interested in taking on the appellate representation of Judge Frank's daughter [footnote omitted]. Judge Altenbernd was entirely proper in making the inquiry of Mr. Vaka and Judge Altenbernd certainly did not attempt to actually retain Mr. Vaka at the request of Judge Frank. Stacy Frank was a lawyer and an adult and Mr. Vaka simply *1232 expressed a willingness to discuss the matter of her representation with her. (T. 486-7). This would have been a new area of practice for Mr. Vaka. Stacy Frank made her own decision to hire Mr. Vaka. (T. 637-8).
The Commission finds that the grievance testimony quoted above was untrue and misleading and violative of the Code of Judicial Conduct.
COUNT IIFailure to Recuse or Advise Counsel
Count II charges that attorneys opposing Mr. Vaka before the Second District Court of Appeal on any panel including Judge Frank, might reasonably question Judge Frank's impartiality. This count deals with both recusal and a failure to advise. The Commission concludes that there has been no clear and convincing proof that Judge Frank was required to recuse himself on cases involving Mr. Vaka, but that the evidence does show clearly and convincingly that he should have advised counsel of the fact that he had been involved in Mr. Vaka taking over the appellate representation.
Judge Frank presented the testimony of Judges Schwartz, Webster, Lazzara and Campbell on this and other issues. Each of these judges are extremely well-respected members of the judiciary and each of them testified unequivocally to the extremely high reputation of Judge Frank for honesty and ethics. (T. 432, 449, 524, 556). This testimony is accepted and we fully recognize Judge Frank's reputation.
Each of these four judges testifying on the issue were asked whether there was a difference between the standard for disqualification and the standard for advising counsel of facts which would reasonably warrant an attorney in questioning a judge's impartiality. There appears to be no clear rule other than case law on the subject of disqualification by an appellate judge. As stated in [In re Estate of Carlton, 378 So.2d 1212, 1216 (Fla.1979)], the decision is a "personal and discretionary" matter with each individual judge. Judge Schwartz testified that there was "perhaps" a difference between the test or standards for recusal and disclosure. (T. 439). Judge Webster testified that the issue was uncertain and that he personally did not know if there was a difference between the standards for disqualification and disclosure. (T. 462). He did agree that, hypothetically, a lawyer would want to know if an appellate judge had an indirect financial interest in an attorney's representation of a family member at less than a market rate. (T. 469-70). Judge Lazzara testified that in his view the standards for recusal and disclosure were basically the same. (T. 540). Judge Campbell testified that he did not know if there was or should be a difference between the test for recusal and the test for disclosure. (T. 572-575).
Despite the above testimony, the Hearing Panel concludes, by clear and convincing evidence, that Judge Frank was at least required to have disclosed the Vaka relationship, and that his failure to do so has created an appearance of impropriety. We note that the prosecution has stipulated that there is no attempt to prove that Judge Frank actually was influenced in the slightest by Mr. Vaka's presence in any case nor was he influenced in any way by the fact that Mr. Vaka was representing his daughter charging her at the rate of $100 per hour rather than at some higher hourly rate which Mr. Vaka might have exacted. Further, the prosecution's statistical analysis prepared by the Clerk of the Second District Court of Appeal arguably demonstrates that Mr. Vaka won more cases when Judge Frank was on the panel than when he was not on the panel. The Commission discounts this evidence and does not rely upon it. There are too many factors which the statistical analysis does not consider. *1233 The same kind of analysis could have been done in regard to any judge on the Second District and Mr. Vaka's statistical won/loss record is irrelevant.
The factors, based on the evidence, which support the Commission's conclusion that disclosure of the Vaka-Frank relationship was necessary and required by the cannons [sic] are here listed and briefly discussed.
While we conclude that Judge Frank was required to disclose the Vaka relationship, we do not suggest that this is required in every situation where a lawyer represents the adult son or daughter of a sitting judge in an isolated litigation matter. However, the Frank-Straley controversy was clearly out of the ordinary and by no means an isolated event. The entire matter became a cause celebre in the Tampa-Lakeland legal community and Judge Frank clearly should have recognized this. The case had directly affected Judge Frank's duties on the courthe ceased hearing all similar cases.
Mr. George Vaka appeared frequently in the Second District Court of Appeal. Prior to taking over the representation of Stacy Frank, he had handled 78 cases before the Second District. (T. 478). Approximately 99% of his cases were insurance company cases and his initial appearance in a dissolution matter which was highly publicized was itself a matter of notoriety.
Opposing counsel and parties could have been aware of Mr. Vaka's representation of Stacy Frank, but would have had no way of knowing of Judge Frank's confidence in Mr. Vaka or the apparent role he played in arranging for the representation through Judge Altenbernd. There is no reason why Stacy Frank could not have made the inquiry of Mr. Vaka herself. The manner in which it was handled indicated to Mr. Vaka, according to his testimony, that Judge Frank wanted him involved. (T. 486-7, 496-7).
Judge Frank was not completely candid in his statements to the newspaper and certainly not in his testimony to the grievance committee, which we have found to be untrue.
Judge Frank was intensely involved and interested in his daughter's divorce case and became extremely adverse to Mr. Straley. This is certainly not an uncommon occurrence in hotly contested dissolution litigation and Judge Frank's conduct, as a parent, is well understood. However, a judge is a judge 7 days a week, 24 hours a day and must act accordingly.
Judge Frank and his wife loaned Stacy Frank $30,000 to assist her in paying her attorney's fees. Again, Judge Frank should have realized that this loan was an additional indirect link to the litigation and to Mr. Vaka. Obviously, the loan could have been used to pay Mr. Vaka. For proper reasons of his own, Mr. Vaka was charging Stacy Frank at a reduced hourly rate. Even though Judge Frank was not responsible for the reduced rate, he well-knew it subjected him to suspicion.
Throughout this entire matter, Judge Frank was well-aware that the dissolution case was of great notoriety. At no point did he simply choose to say "no comment," In fact, it is apparent that at almost every opportunity he let it be known that he was a sitting District Court of Appeal Judge. (T. 314, 367).
After the Fifth District sitting as the Second District, issued the initial Straley opinion [Straley v. Frank, 585 So.2d 334 (Fla. 2d DCA 1991)], Judge Frank chose to disqualify himself in all domestic relations cases. Such cases are a major portion of the Second District's workload and this was a major step and totally out of character for Judge Frank. This step clearly indicates the intensity of Judge Frank's interest and feelings concerning his daughter's divorce case. The lawyers and litigants before the Second District would not have known *1234 that Judge Frank no longer sat on divorce cases, but did continue to sit on cases handled by the lawyer he had recommended to his daughter to right what Judge Frank viewed as a very serious wrong.
Based on all of the above, we conclude that Judge Frank should have disclosed the facts concerning Mr. Vaka's representation of his daughter to counsel opposing Mr. Vaka. Of course, a very simple solution would have been for Judge Frank to simply add Mr. Vaka to his recusal list....
COUNT IIIInterference with Grievance Procedure
Based upon all of the evidence, the Commission concludes that Judge Frank improperly asserted his judicial position and the power of his office in a manner unbecoming to his office in regard to the grievance case against Mr. Straley. Judge Frank certainly had the right to file a complaint with the Bar regarding Mr. Straley. However, thereafter he continually attempted to control the process and even after the grievance was determined in Mr. Straley's favor, he exerted pressure against The Florida Bar and made serious accusations against Bar staff for allegedly mishandling the matter. We note that Judge Frank has apologized and, in retrospect admitted that he should have been "more gentle" and that he overreacted. However, the Commission finds that his conduct amounts to an abuse of power and lessens the confidence of the public in the judiciary....
COUNT IVThe Weber Matter
The prosecution asserts that Judge Frank threatened to use his judicial office in an improper manner in a brief telephone conversation with Mr. Kurt Weber. The testimony on this issue was so disputed that the panel was unable to resolve the conflicts and reach any conclusion based on clear and convincing evidence. Accordingly, in the absence of clear and convincing evidence Count IV is dismissed.
Based on the above findings, the Hearing Panel concluded that Judge Frank had violated Canons 1, 2, and 3 of the Code of Judicial Conduct.
In considering the various issues presented, it is helpful to understand the applicable standard of review:
Before reporting findings of fact to this Court, the JQC must conclude that they are established by clear and convincing evidence. In re McAllister, 646 So.2d 173, 177 (Fla.1994). This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a "preponderance of the evidence" but the [sic] less than "beyond and to the exclusion of a reasonable doubt." In re Davey, 645 So.2d 398, 404 (Fla.1994). If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this Court. See In re LaMotte, 341 So.2d 513, 516 (Fla.1977). This is so because the JQC is in a position to evaluate the testimony and evidence first-hand. See In re Crowell, 379 So.2d 107, (Fla.1979). However, the ultimate power and responsibility in making a determination rests with this Court. Id.

In re Graziano, 696 So.2d 744, 753 (Fla. 1997). With this standard of review in mind, we now turn to analyze the Hearing Panel's findings and conclusions regarding each individual count.

Count I
Count I concerns two statements made by Judge Frank while testifying, under oath, before the grievance committee in the Straley grievance matter. Judge Frank does not dispute the fact that he made the two statements in question; instead, he argues that discipline is unwarranted as to this count because (1) the two *1235 statements were true; and (2) even assuming they were not true, they were not material to the Straley grievance matter.[4] Based on the following, we conclude that the Hearing Panel's conclusions as to the first statement are not supported by clear and convincing evidence; however, we do approve the Hearing Panel's conclusions as to the second statement.

A. Judge Frank's First Statement: "I will tell you, I have studiously stayed away from Stacy's divorce litigation."
The first statement found by the Hearing Panel to be false and misleading occurred in the following exchange between Straley's counsel and Judge Frank during the grievance proceeding:
Q. [Straley's counsel] Well, you would agree that the article is accurate insofar as it indicates that Straley won on appeal with respect to the meat of the issue. Right?
A. [By Judge Frank] I will tell you, I have studiously stayed away from Stacy's divorce litigation.
In his answer to the formal notice filed by the Investigative Panel, Judge Frank quotes the continuation of his answer:
I will tell you also that I don't believe I've even read more than once any of the opinions that came out of the Fifth District.
And I've had a Fifth DistrictI've been with the Fifth District Judges on several occasions and I have never discussed Stacy's case with any of them. I just don't know that much about it. I have stayed out of it.
I do know that Judges have come to me and have said there was a bizarre result that was reached over in the Fifth District, but I've never commented about that to anyone.
Contrary to the Hearing Panel's findings, the record does not clearly and convincingly establish that Judge Frank's statement was false and misleading when considered in the total context. The statement at issue was made while Judge Frank was being questioned concerning the particular substance of an issue addressed in one of the five appellate decisions rendered in connection with this litigation over the course of six years.[5] In our view, the response can reasonably be interpreted in context to indicate that Judge Frank had not studied particular issues and that he could not discuss the substance of those issues. Moreover, while the evidence shows that Judge and Mrs. Frank loaned Stacy $30,000 in 1989 to help her pay her trial counsel's attorney's fees, and that Judge Frank spoke with Judge Altenbernd about George Vaka's competence to handle a matrimonial matter, those facts alone do not render false Judge Frank's statement that he had "studiously stayed away" from Stacy's divorce litigation. In fact, given the extensive nature of the Frank-Straley litigation, the limited involvement on Judge Frank's part in several matters which were ancillary to the divorce litigation show that his conduct with regard to appellate decisions *1236 and substantive issues was entirely consistent with the statement at issue.

B. Judge Frank's Second Statement: "It's absolutely true. I never discussed with Chris Altenbernd the representation of my daughter, to the best of my knowledge."
The second statement made by Judge Frank during the grievance hearing took place during questioning concerning George Vaka and the St. Petersburg Times article. The following exchange took place between Judge Frank and Straley's counsel in this regard:
Q. [Straley's counsel] I have a question about-if you turn over to the article-actually, you don't have to because there's a copy on the table here. In the fourth column
A. [Judge Frank] That's the last column on the right?
Q. the last column on the right-hand side, in the fourth full paragraph down, the reporter quotes you as saying that you were unaware that Chris Altenbernd asked George Vaka to represent your daughter.
A. Right.
Q. Is that true?
A. It's absolutely true. I never discussed with Chris Altenbernd the representation of my daughter, to the best of my knowledge.
Based upon our review of the evidence presented, we find that there was sufficient proof before the Hearing Panel to support its finding that the statement was false or misleading. The record shows that in the summer of 1991, after the Fifth District's initial en banc decision in Straley, 585 So.2d at 334, Stacy Frank's lawyer, Steve Sessums, suggested that she retain an appellate lawyer to represent her in a petition for review before this Court. After finding that a particular appellate lawyer with expertise in the matrimonial field could not represent her due to a conflict of interest, Stacy Frank decided that she would prefer to be represented by an appellate specialist, even if he or she did not have experience with matrimonial cases. After experiencing difficulty finding someone on her own, she consulted with Judge Frank, who said, "I don't know. One person that comes to mind is George Vaka."
Subsequently, Judge Altenbernd happened to be in Judge Frank's chambers for reasons unrelated to this case. While in chambers, Judge Frank "brought up the subject of an interest in hiring ... an appellate lawyer to handle a domestic matter." Judge Frank asked Judge Altenbernd to recommend a good appellate lawyer to handle a matrimonial matter. Judge Altenbernd responded by recommending three appellate lawyers with experience in matrimonial law. Judge Frank indicated that "he wasn't excited about any of the three names," and then raised Mr. Vaka's name on his own, asking Judge Altenbernd if Mr. Vaka "could handle a matrimonial matter."
Judge Frank knew that, before taking the bench, Judge Altenbernd had practiced with Mr. Vaka and that the two were good friends. Through their discussion, Judge Altenbernd testified that it became apparent to him that Judge Frank wanted Mr. Vaka to represent his daughter before this Court. Pat Frank, Judge Frank's wife, testified that Judge Frank "asked Chris Altenbernd to ask George Vaka if he were capable of handling a marital law case, knowing that they had worked together, that it would be more delicate for the conversation to take place between Chris Altenbernd and George Vaka than for [Judge Frank] to say, `Are you competent?'" Judge Altenbernd told Judge Frank that he would call Mr. Vaka to see if he would be interested in accepting the representation. Judge Altenbernd offered to call, rather than Judge Frank or Stacy Frank calling directly, so that Mr. Vaka would not feel pressured to take the case due to Judge Frank's position.
Judge Altenbernd testified that after his conversation with Judge Frank, he returned *1237 to his chambers and called Mr. Vaka, telling him that Judge Frank was interested in Mr. Vaka representing "probably" Stacy. Mr. Vaka, who had no experience with matrimonial cases, asked Judge Altenbernd if Stacy's case was "something that I could handle." Judge Altenbernd assured Mr. Vaka that he could decline the representation if he so wished and that "no one was going to think less of him if he said no." He also warned Mr. Vaka that there was a lot of personal animosity in the case. Judge Altenbernd further suggested that Mr. Vaka should think carefully about billing Stacy Frank and should not take the case on a pro bono basis. They also discussed the fact that the case was "high-profile" in nature and might help Mr. Vaka expand his appellate practice to include matrimonial cases.
During the telephone conversation, Mr. Vaka told Judge Altenbernd that he would consider the representation. While Mr. Vaka could not recall whether Judge Altenbernd specifically told him that Judge Frank asked Judge Altenbernd to call, he strongly believed that Judge Frank must have done so because Judge Altenbernd would have no other reason for becoming involved.
After his conversation with Mr. Vaka, Judge Altenbernd either returned to Judge Frank's chambers or called Judge Frank on the phone and told him that Mr. Vaka would consider the representation and that Stacy Frank, Pat Frank or Judge Frank should contact Vaka directly. Judge Frank admitted that Judge Altenbernd specifically told him that Vaka was willing to consider representing Stacy and that she should contact Vaka directly. Pat Frank also confirmed that Judge Altenbernd reported back that Vaka was willing to speak to Stacy Frank. Judge Frank subsequently told Stacy that Judge Altenbernd had spoken with Vaka and that Vaka was willing to speak with her.
Judge Frank argues that the statement in question is literally true because (1) he never mentioned Stacy's name to Judge Altenbernd, and (2) he never "discussed" Stacy's representation with Judge Altenbernd. We disagree. These may be subtle distinctions, but are totally insufficient to overturn the findings below.
First, Judge Frank is technically correct in that there is no evidence that he mentioned Stacy by name. Judge Altenbernd also testified that he could not recall whether Stacy's name was specifically discussed. Judge Altenbernd did testify, however, that it was clear that Judge Frank was discussing representation for his daughter. Further, while Judge Frank denied telling Judge Altenbernd that the representation was "for Stacy," he admitted that he was in fact referring to Stacy's representation and that Judge Altenbernd must have deduced that fact. Thus, we find it unpersuasive that the name "Stacy" was not actually mentioned.
Second, Judge Frank's argument that his exchange with Judge Altenbernd did not constitute a "discussion" is equally unpersuasive. The record clearly indicates that Judge Frank and Judge Altenbernd discussed whether Mr. Vaka was competent to handle a matrimonial matter on appeal, again, with both of them understanding, at least implicitly, that Stacy was being discussed; Judge Altenbernd informed Judge Frank that he would be in contact with Mr. Vaka regarding the possible representation; Judge Altenbernd in fact discussed the matter with Mr. Vaka; and Judge Altenbernd relayed Mr. Vaka's willingness to speak to Stacy back to Judge Frank. Moreover, the absolute nature of his statement (i.e., that he had "never" discussed the matter with Judge Altenbernd) makes Judge Frank's position on this issue even more tenuous.

C. Materiality
Judge Frank's final argument concerning Count I is that even if his statements were untrue, those statements were not material to the Straley grievance proceeding, and therefore cannot support a finding that he breached the Code of Judicial *1238 Conduct. In making this argument, Judge Frank relies on this Court's decision in In re Davey, wherein this Court found that a judge's false statement must concern a "material issue in the case" before that judge may be disciplined for a lack of candor before the JQC. See 645 So.2d at 406. The JQC distinguishes In re Davey from this case by pointing out that this case involves alleged misstatements before a separate grievance committee, not before the JQC in defending charges already under consideration. Indeed, in reviewing In re Davey, it appears that this Court's concern in that case was that every judge who maintained his or her innocence before the JQC, but was later found guilty, would be subject to a lack of candor charge on every occasion. See id. at 406-07. Additionally, here it was Judge Frank who initiated the grievance proceedings and was attempting to have discipline imposed upon an attorney based upon alleged misstatements to the press. If we cannot and do not expect and demand candid and truthful testimony from an appellate judge under these circumstances we will have then abdicated our responsibility to the people of Florida. Therefore, we would agree with the JQC that materiality is not required to find misconduct under the circumstances in this case.

Count II
Count II presents a novel issue to this Court; namely, whether different standards should control when appellate court judges must disqualify themselves, as opposed to when appellate judges must only disclose on the record information that might be relevant to a recusal determination. In the present case, the Hearing Panel found that although Judge Frank was not required to disqualify himself from cases in which Mr. Vaka appeared before the Second District, he should have disclosed to counsel opposing Mr. Vaka "the facts concerning Mr. Vaka's representation of his daughter." We settle this question by holding that different standards should govern disqualification and disclosure. We further conclude that the Hearing Panel was correct in finding against Judge Frank on this count.
In In re Estate of Carlton, this Court held that "each justice must determine for himself both the legal sufficiency of a request seeking his disqualification and the propriety of withdrawing in any particular circumstances." 378 So.2d at 1216. This Court found that such a procedure reinforces the modern view that disqualification is "personal and discretionary with the individual members of the judiciary." Id. at 1216-17 (quoting Department of Revenue v. Leadership Housing, Inc., 322 So.2d 7, 9 (Fla.1975)).
Canon 3E of the Code of Judicial Conduct sets forth the guidelines governing disqualification:
(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(b) the judge served as a lawyer or was the lower court judge in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;
(c) the judge knows that he or she individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

*1239 (d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) is acting as a lawyer in the proceeding;
(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;
(iv) is to the judge's knowledge likely to be a material witness in the proceeding.
The commentary to Canon 3 provides the following guidelines regarding disclosure:
A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification. The fact that the judge conveys this information does not automatically require the judge to be disqualified upon a request by either party, but the issue should be resolved on a case-by-case basis.
This Court added the second sentence of this commentary governing disclosure in In re Code of Judicial Conduct, 659 So.2d 692, 693 (Fla.1995).
Reading the text of Canon 3E governing disqualification together with the Commentary governing disclosure, it appears that a distinction has been made between the two circumstances. Specifically, because a judge "should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification," it appears that the standard for disclosure is lower. In other words, a judge should disclose information in circumstances even where disqualification may not be required. This view is supported by several decisions from other jurisdictions. See O'Neill v. Thibodeaux, 709 So.2d 962, 967-68 (La.Ct. App.1998) (finding that trial judge correctly disclosed that he occasionally played cards with one of the parties, even though the judge was not required to disqualify himself from presiding over the case on that basis); Collier v. Griffith, 1 No. 01-A-01-9109-CV00339, 1992 WL 44893 at *4-*5 (Tenn.Ct.App. March 11, 1992) (analyzing Comment to Canon 3 of the Code of Judicial Conduct and stating that "[g]iven the seminal importance of impartiality, both in fact and in appearance, we find that judges should disclose any information that the parties or their lawyers might consider relevant to the disqualification issue"). Therefore, we would agree with the Hearing Panel that there are different standards for disqualification and disclosure.
Having determined that different standards apply for disqualification and disclosure, we now address the Hearing Panel's conclusion that Judge Frank should have disclosed his connection with Mr. Vaka. The Hearing Panel cites several factors to support its conclusion, including (1) the fact that the Frank-Straley divorce litigation was "out of the ordinary and by no means an isolated event"; (2) the fact that the Frank-Straley divorce litigation had directly affected Judge Frank's judicial duties because he had disqualified himself from all domestic relations cases after the judges of the Fifth District, sitting as the Second District, issued their first en banc decision; (3) Judge Frank's conversation with Judge Altenbernd concerning Mr. Vaka indicated that Judge Frank wanted Mr. Vaka involved in Stacy's case; (4) Judge Frank became extremely adverse to Mr. Straley; and (5) Judge and Mrs. Frank loaned Stacy $30,000 to pay for attorney's fees "which could have been used to pay Mr. Vaka."
Focusing on the totality of the circumstances, we agree that Judge Frank should have, at a minimum, disclosed the fact that Mr. Vaka was directly involved in *1240 the representation of a member of his immediate family. Judges must do all that is reasonably necessary to minimize the appearance of impropriety. They must remain cognizant of the fact that even in situations where they personally believe that their judgment would not be colored, public perception may differ.
Here, a father, rightfully and properly concerned with the very personal life circumstances of his daughter, was in a position to make decisions in cases involving the person who was attempting to protect those same personal interests. The highly contentious nature of the very personal domestic litigation involving the daughter of a judicial officer was not simply some routine matter of small consequence. Had the representation in the underlying matter been related to an amicable real estate transaction or uncontested circumstances, the prism though which this issue would be viewed might be somewhat different.
However, the natural and understandable human nature to be protective under these most testing circumstances, and the role Mr. Vaka assumed in attempting to aid the cause of Judge Frank's daughter, leads to the inescapable conclusion that the true and full facts should have been disclosed. Judge Frank was not required to be more than human; he was simply required to not keep secret the relationship and representation. If upon disclosure of the true facts any party had objected to Judge Frank's participation, he would have been required to recuse himself from the case.

Count III
As to this count, the Hearing Panel found that Judge Frank "improperly asserted his judicial position and the power of his office in a manner unbecoming to his office in regard to the grievance case against Mr. Straley." Based on the evidence in the record regarding this count, we must disagree with the Hearing Panel's conclusion since there does not appear to be clear and convincing evidence to support that conclusion.
Three people who worked for the Bar during the Straley grievance matter testified on behalf of the prosecution before the Hearing Panel. The first witness was Joseph Corsmeier, the Bar prosecutor who handled the complaint against Mr. Straley. The second witness was David Ristoff, Mr. Corsmeier's supervisor during the pendency of the Straley grievance proceeding. The third witness was John Anthony Boggs, the Director of Lawyer Regulation for the Bar at the time of the Straley grievance proceeding.
Based on the testimony of these three witnesses, it is clear that Judge Frank expressed his displeasure with the handling of the grievance proceedings against Mr. Straley. It is also apparent that those involved in the process were aware that he was the Chief Judge of the Second District Court of Appeal. However, none of the witnesses testified that Judge Frank overstepped his bounds or inappropriately utilized his office in complaining of the competence of Bar counsel prosecuting the grievance proceeding, nor did he bypass the appropriate channels for making such complaints. While Mr. Corsmeier, Mr. Ristoff, and Mr. Boggs may have been more deferential to Judge Frank because of his position, none of those witnesses testified that Judge Frank ever asked for or demanded special treatment based on his position. Knowledge that one is a judicial officer or respectful conduct in response to such knowledge does not automatically translate into a determination that a judicial position has been abused. Judge Frank did not forfeit the right to make proper inquiry concerning the pending matters simply because he held judicial office. A judicial officer should not be sanctioned simply because those with whom he or she has interaction are aware of the official position. The use of a judicial position or power of the position in an unbecoming manner requires more than simply someone being aware of one's position. The gravamen of the charge under the circumstances requires that there be *1241 some affirmative expectation or utilization of position to accomplish that which otherwise would not have occurred. The testimony here demonstrates that those interacting with Judge Frank were aware of his position, but their actions, while respectful of his position, were none other than those normally expected under any other circumstance. Accordingly, based on all of the testimony relevant to this count, it does not appear that there is clear and convincing evidence to support the Hearing Pane's conclusion on this count.

Alleged Breaches of Confidentiality
One final matter that merits mention involves two motions filed by Judge Frank alleging a violation of article V, section 12(a)(4) of the Florida Constitution and Florida Judicial Qualifications Commission Rule ("FJQCR") 23, both of which require that all matters in a JQC proceeding remain confidential until the notice of formal proceedings is filed with the clerk of this Court. The first motion concerned an alleged breach by Craig Weber, a witness who eventually testified before the Hearing Panel. The second motion alleged a breach of confidentiality by one or more members of the Investigative Panel. At a joint session on October 23, 1998, the full JQC considered Judge Frank's motions and ruled that, taking the allegations as true, Judge Frank was not prejudiced in defending against the charges brought against him. See In re Graziano, 696 So.2d 744, 752 (Fla.1997) ("The due-process concern involved with respect to the confidentiality requirement is whether the reported information prejudiced respondent's rights to a fair hearing."). Our review of the record does not reveal any facts that would support a finding of prejudice. Thus, we accept the full JQC's determination on this matter.
We conclude that the record is, at best, skeletal on this issue. The JQC did not make a determination that confidentiality had been breached. We do not have sufficient information to independently reach a conclusion as to whether there was an actual breach of confidentiality in this case; nor can we determine the depth of any discussion or investigation undertaken of this issue by the JQC at its joint session on October 23, 1998. We again express our concern that the requirements of confidentiality be observed in proceedings before the Commission. We reiterate our statement in this respect in In re Graziano:
We agree with respondent that the JQC must provide reasonable safeguards against any breaches of the confidentiality requirements by itself, its staff, and its counsel. In this case, the source of the disclosed information is unknown. We find no basis to conclude that there was a breach of the JQC's obligation of confidentiality in respect to the JQC, its staff, or its counsel being the source of the information in the newspaper articles. Moreover, as we earlier noted, the confidentiality requirements promote the effectiveness of the judicial disciplinary process and protect judicial officers from unsubstantiated charges.

696 So.2d at 752 (emphasis added). We request that the Commission be ever mindful of the implementation of those rules relating to confidentiality which give to all involved in the Commission's proceedings confidence that confidentiality will be observed.

Conclusion
We understand that it would be beyond logic to suggest that judges must remain detached from matters important to them and their families. However, the JQC is correct in noting that a "judge is a judge 7 days a week, 24 hours a day." While judges are human and also have parents, siblings and spouses, these relationships cannot be used to excuse the abuses which occurred here. We must not forget that those entrusted with the authority to carry out justice have the burden to not fail that awesome responsibility; fulfillment of that responsibility encompasses, inter alia, being entirely forthcoming in all judicial or quasi-judicial proceedings irrespective of whether one appears as a witness, a party, or a judge.
*1242 Here, a judicial officer initiated a proceeding and then provided false or misleading testimony which compromised the integrity of the system he was sworn to uphold. Concealment of a special relationship with counsel appearing before him served to aggravate the circumstances. Because we find that Judge Frank's conduct, as detailed above, falls far short of the standards required of judges, we agree with the JQC that a public reprimand is appropriate. We have also come to conclude that when the conduct of a jurist is so egregious as to require a public reprimand, such reprimand should be issued in person with the defaulting jurist appearing before this Court. If it were not for his retired status, advanced age and health concerns, we would require Judge Frank to personally appear before this Court to receive the public reprimand, which shall hereafter be the manner in which such reprimands are issued. However, based exclusively upon the factors unique to Judge Frank at this time, this opinion is issued as the public reprimand in this case.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
QUINCE, J., recused.
NOTES
[1] Judge Frank, age 72, recently retired from the bench in January 1999. His retired status, however, does not deprive this Court of jurisdiction. See In re Hapner, 718 So.2d 785, 787-88 (Fla.1998) (relying on article V, section 12 of the Florida Constitution in exercising jurisdiction over a case where the judge already had resigned from the bench).
[2] "I will tell you, I have studiously stayed away from Stacy's divorce litigation."
[3] "It's absolutely true. I never discussed with Chris Altenbernd the representation of my daughter, to the best of my knowledge."
[4] Judge Frank also challenges the fact that the prosecution did not introduce a transcript of the entire grievance hearing so that his testimony could be considered in its full context. However, it is clear that the portions of the transcript that were introduced before the Hearing Panel allowed the panel to consider the questions posed to Judge Frank and his complete answers thereto. Indeed, in his answer to the formal notice filed by the Investigative Panel, Judge Frank quoted portions of the hearing transcript not quoted in the formal notice to ensure that his testimony was viewed in context. Therefore, Judge Frank is not entitled to relief on this basis.
[5] The hearing panel took judicial notice of five appellate decisions relating to the Frank-Straley divorce: Straley v. Frank, 585 So.2d 334 (Fla. 2d DCA 1991); Frank v. Straley, 602 So.2d 1278 (Fla.1992); Straley v. Frank, 612 So.2d 610 (Fla. 2d DCA 1992); Straley v. Frank, 650 So.2d 628 (Fla. 2d DCA 1994); and Straley v. Hosman, 677 So.2d 24 (Fla. 2d DCA 1996). The latest decision, Hosman, provides a comprehensive summary of the lengthy divorce litigation. See 677 So.2d at 24-25.