PER CURIAM.
We review the recommendation of the Judicial Qualifications Commission (“JQC”) that Judge Richard H. Albritton, Jr. receive the sanction of a public reprimand, a thirty-day unpaid suspension from office, a $5000 fine, and payment of the costs of the JQC for violating the Code of Judicial Conduct. We have jurisdiction. See art. V, § 12, Fla. Const. As explained in more detail below, we approve the JQC’s recommendation.
The instant action arose from charges filed against Judge Albritton alleging a pattern of improper conduct during his judgeship. On May 18, 2005, the JQC filed a notice of formal charges against Judge Albritton charging him with thirty-six ethical violations. On September 1, 2005, the JQC filed an amended notice of formal charges which provided greater specificity with regard to the violations of the Code of Judicial Conduct to correspond with each alleged ethical breach. Judge Albritton was charged with violating Canons 1, 2, 3, 4, and 5 of the Code of Judicial Conduct.[1] The JQC’s Amended
*1085 Notice of Formal Charges set forth, in pertinent part, the following:
1. On or about May 14, 2004, in a telephone call which you initiated, you advised Jennifer D. Wells, Court Administrator for the Fourteenth Judicial Circuit, that you do not want her to work with you or to do anything associated with you or your office. You further told her that if necessary, you would enter an order barring her from your office and from doing anything concerning you, and that you would find her in contempt if she disobeyed the order. You also told her that she should not go to Chief Judge Judy Pittman and tell her about the call, and that if she did, she did not want to know what you would do.
2. Despite three requests, you failed to respond to a fax message from the Florida Department of Corrections dated May 6, 2004, requesting clarification of the sentence you imposed on Otha Lee Abney, Jr., DOC Number 583365.
3. In February 2003, you advised Kara Berlin, Trial Court Staff Attorney, in the Jackson County Courthouse, not to talk with assistant state attorneys.
4. At various times between February 2003 and February 2004, during breaks in trials, you entered and sat in the public defender’s office in the Jackson County Courthouse in your robe.
5. During the same time period, you required as a condition of probation that a defendant attend church. When advised by the staff attorney that this was unconstitutional, you responded, “I know that’s wrong, but the defendant doesn’t know it.”
6. In the case of Walter Anthony Hayes, in which Hayes had served six months in jail, there was an ineffective assistance of counsel hearing. You granted a portion of the defense request for ineffective counsel and granted the defendant a new trial. In a meeting with an assistant state attorney and defense attorney, the prosecution offered Hayes a settlement of ten years in prison and you said, “I’ll give him seven,” and imposed that sentence.
7. In or about 2004, a female probation officer recently went through a divorce and at the end of a hearing, while people were still in the courtroom, you asked her about her divorce.
8. In a juvenile delinquency case involving a female defendant in court who had turned 18, but who had committed a crime when she was a juvenile, you made a comment from the bench as to *1086 how attractive she was. You then gave her a lighter sentence than you ordinarily would have given.
9. On an ongoing basis, you are late to hearings and trials. For example, when a matter is noticed for 1:30 p.m., it will typically not begin before 2:30 p.m. You also take purportedly short breaks of fifteen minutes and do not return for as much as one to two hours. This often results in the proceedings going beyond normal closing time.
10. Following a pattern, you inquire of mothers, “What are your drugs of choice?” in open court when this has nothing to do with the matter in question. You do this to humiliate female defendants. For example, you will say, “Once a drug addict, always a drug addict,” to a female in open court, or, “I think you should get a 40 hour a week job.”
11. During a hearing in In the Interest of Angel Pope, Jackson County Case 2002-136-CJ, on September 4, 2002, you put a young mother in a holding cell for most of the day because she could not recall what her address was.
12. A teenage girl had been charged with a crime and had served time in juvenile detention. The girl told you she was pregnant. You asked her who the father was and when she wouldn’t tell you, you put her back in juvenile detention and said she could stay there until she told you who the father was.
13. In In the Interest of Kah Kahlia Guilford, Jackson County Case Number 02-175-CJ, you jailed a young mother who came before you on a dependency court hearing after stating that she had had contact with the other party in the domestic violence matter. The attorney for the mother objected as she had no notice that the domestic violence matter would come up. You jailed her for 15 to 20 days.
14. You are often very demeaning to attorneys, and especially DCF attorney Tara Melton, Esquire, who is of African-American ancestry.
15. For example, when you first went to the bench, you asked Ms. Melton what church she attended and remarked that “your people helped me get elected.” Melton responded, “Who are my people?” and you replied, “Black people.” This was said in front of Ms. Melton’s colleagues. At another time when Ms. Melton went into your chambers for a case following a hearing involving a family also named Melton, you said “Ms. Melton, I just spent the whole day with your people.” She replied, “I don’t recognize anyone from my family,” and you said, “They were in here acting ugly. They must be your people as the last name was Melton.”
16. You repeatedly address Ms. Melton as “Tara” while addressing others as Mr. or Mrs.
17. You would often say to mothers, “Women should be at home with their kids.” Such comments were in fact directed to other working mothers in the courtroom, including attorneys.
18. You said words to Ms. Melton to the effect of, “I’ve never threatened you with a bar complaint,” when in fact you had threatened her twice.
19. From the bench you said, ‘You know, Mrs. Baker (a case worker), you and I have already talked about this case.” You would tell Department of Children and Families (DCF) workers outside of court how you were going to rule and how to present a case if you didn’t like the people.
20. You told one lady named Tanya Patterson, on the record and in open *1087 court, that she needed to close her legs and stop having babies.
21. In a case involving the Goebel family, you had ex-parte communications with Ms. Melton. Ms. Melton had concluded that she did not have [a] case as the mother had completed her case plan and they were stipulating that the children go with the mother with supervision. You said “no” to the stipulation, and at a court break, you called Ms. Melton back to your office. You said words to the effect of “that lady is a piece of trash and I know the DCF is offering her a stipulation, but I want her kids adjudicated dependent and I don’t want her to ever get her kids back.” As a result, the case went to trial with DCF having a very weak case and you adjudicated the children dependent.
22. When you first went on the bench, you met with DCF personnel in Panama City so they could get to know you. You offered everyone coffee, except Ms. Melissa Bowers Long. You offered Ms. Long milk saying it was because she was so young.
23. In Marianna, Florida, you said to Ms. Long that you know black ministers in the area and told her that she should try and associate with them. She had told you that her father is a black minister.
24. In dependency cases, when a parent comes before you, you would sometimes ask the person if they were using drugs and if the person said “no,” you might order a drug test on the spot. If the test came back positive, you would hold the person in contempt and have them immediately jailed.
25. You would occasionally ask attorney John Young Roberts about hunting. You stated that during the fall of 2004, you would like to go hunting with him and he said that would be fine. You then asked if he was available that weekend and you went hunting with him.
26. You asked Mr. Roberts if he was a friend of the person that held a Christmas party. Mr. Roberts said he was, and you asked if he could get you an invitation to the party. On the date of the party, your assistant called Mr. Roberts to ask if he could fax the invitation to you. He did so, and you attended the Christmas party.
27. Sometime during the spring of 2004 during a recess while getting coffee, you told Mr. Roberts that you were leaving Jackson County to go to Bay County. You continued by stating that you had enjoyed your time in Jackson County and wanted to see everyone in Jackson County and told Mr. Roberts to throw you a party. You said you wanted the party at the friend’s house where you had gone to the Christmas party. Mr. Roberts did nothing.
28. You would allow your clerk, Sue, to make comments and act like a mini-judge. For example, if you were talking about child support, Sue would remark under her breath, but loud enough for everyone to hear, “Obviously got money for cigarettes.” She would also participate in hearings and would remind you what had happened in a prior hearing. For example, she would say, “remember, this is the guy who last month said.... ”
29. In or about the spring of 2004, Elizabeth Milton Simpson, Esquire, was in your court when you called her up to the bench. You stated, to the effect, “You heard they’re giving me a party. We need people to donate money and you need to give $100 to Jerry Glass (an investigator for the public defender)”. A day or so later while in court you mentioned the money to her. She then wrote a check, payable to Jerry Glass, *1088 gave it Glass and told him to make sure he told you she had paid.
30. Approximately eight months ago, you asked Stephanie Shimer, Esquire, and Ms. Simpson to go to lunch with you. In the case of Taylor Dumas, Case No. 03-06, you had ordered the DCF to directly pay defense attorneys Shimer and Simpson as opposed to the county paying the legal bills as you did not like the case DCF had brought. At lunch you said words to the effect of, “I need you to put this language in your motion and I want you to draft an order saying this/’ and then you said what you wanted in the order. You insisted you wanted them to write it down so Ms. Shimer did so. The motion was filed and you issued the order.
31. During court one day you said, “Ms. Simpson, are you taking us to lunch today?” Ms. Simpson said she responded, “I guess so”, and about eight people went to lunch. Ms. Simpson said the bill came to just under $100 which she paid.
32. You told Ms. Simpson’s husband that you do not have a high opinion of female lawyers. You added, “I am not referring to your wife.”
33. Wade Mercer, Esquire, appeared in a dependency case and after the dependency case was concluded, you said you wanted to talk with him. He went in to your chambers, and you told him you were concerned that in the hearing there was an objection you thought Mr. Mercer should have made. You continued, “I intend for DCF to prove their case.”
34. While hearing a case tried by Mr. Mercer and Ms. Elizabeth Simpson, you told Ms. Simpson, “If your client doesn’t plead, I’m going to revoke your client’s bail.”
35. In order to avoid ex parte communications with you, the public defenders send their investigator, Jerry Glass, to talk with you about pending cases because he is not an attorney.
36. On or about June 15, 2004, at the party for you, Mr. Glass presented you with a gift certificate for $150.00 from Wal-Mart from the party contributors.
On May 19, 2006, the JQC and Judge Albritton presented a stipulation to this Court pursuant to article V, section 12 of the Florida Constitution, and Florida Judicial Qualifications Commission Rule 6(j). In that stipulation, Judge Albritton admitted fourteen of the thirty-six original charges and the impropriety of that conduct,[2] waived his right to a hearing before the JQC and oral argument before this Court, and stipulated to the recommended discipline. The JQC recommended a public reprimand, a thirty-day unpaid suspension from office, a $5000 fine, and that Judge Albritton pay the costs of the JQC, in the amount of $1,203.70. Based on these stipulated facts, we approve the JQC’s recommendation.
This Court may “accept, reject, or modify in whole or in part” the findings and conclusions of the JQC. Art. V, § 12(c)(1), Fla. Const. Judge Albritton has stipulated to the conduct in the fourteen charges that the JQC ultimately found him guilty of. Because Judge Al-britton admits to this alleged wrongdoing, we accept the commission’s findings. This Court has stated that “[i]n cases where a judge admits to wrongdoing and the JQC’s finding are undisputed this Court will ordinarily conclude that the JQC’s findings are supported by clear and convincing evi *1089 dence.” In re Diaz, 908 So.2d 334, 337 (Fla.2005) (citing In re Andrews, 875 So.2d 441, 442 (Fla.2004) (“Judge Andrews admitted to the conduct alleged by the JQC. Accordingly, the JQC’s findings are supported by clear and convincing evidence.”)).
We next address whether we should approve the recommended discipline of the JQC. In the instant matter, the conduct of Judge Albritton violates a substantial number of the canons of the Code of Judicial Conduct for a variety of reasons. Hence, this is not a case in which the violations tend toward one variety. For example, in In re Schapiro, 845 So.2d 170 (Fla.2003), we approved the discipline of a public reprimand, psychological therapy, and public letters of apology for a judge who engaged in a pattern of rude and intemperate courtroom behavior directed to attorneys appearing before the judge that occurred over a long period of time. See id. at 174. In the instant matter, Judge Albritton’s conduct covered a broad range of improper acts which (1) called into question his impartiality, see, e.g., charges 4 and 33; (2) evinced improper courtroom decorum, including intemperate behavior towards litigants, see, e.g., charges 11 and 24; (3) involved his use of judicial office for personal gain, including several instances in which Judge Albritton used his position to pressure attorneys in the community and who practiced before him to expend personal monies for his entertainment, see, e.g., charges 29 and 31; and (4) on one occasion, evinced an intentional and conscious abrogation of the constitutional principles he had sworn to uphold, see charge 5. These violations are extreme not only in their number and seriousness, but also in the plethora of code violations they encompass. This conduct demonstrates not only a lack of judicial temperament but also, and more importantly, Judge Albritton’s use of his office to pressure individuals to act for his own benefit. This conduct clearly falls far and inexcusably short of the high standards of integrity and independence that we demand of our judicial officers. Additionally, Judge Albritton has expressly agreed to the recommended discipline. Based on the egregiousness of the conduct of Judge Al-britton and the stipulation between the JQC and Judge Albritton, we accept and approve the recommended discipline.
Accordingly, we approve the stipulation and direct Judge Albritton to pay both the $5000 fine and the JQC’s costs in the amount of $1,203.70, and serve the thirty-day unpaid suspension. Additionally, in accordance with the policy announced in In re Frank, 753 So.2d 1228 (Fla.2000), we hereby command Judge Richard H. Albrit-ton to appear before this Court for the administration of a public reprimand on September 18, 2006, at 9 a.m., as directed by this Court in a separate order.
It is so ordered.
LEWIS, C.J., and WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which PARIENTE, J., concurs.

. The specific sections of the canons that the JQC ultimately found were violated by Judge Albritton’s actions provide as follows:
*1084 Canon 1. A Judge Shall Uphold the Integrity and Independence of the Judiciary
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
Canon 2. A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge’s Activities
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary-
B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.
[[Image here]]
Canon 3. A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently
A. Judicial Duties in General.
The judicial duties of a judge take precedence over all the judge's other activities. The judge's judicial duties include all the duties of the judge's office prescribed by law. In the performance of these duties, the specific standards set forth in the following sections apply.
B. Adjudicative Responsibilities.
(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.
(2) A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism.
(3) A judge shall require order and decorum in proceedings before the judge.
(4) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.
(5)A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status, and shall not permit staff, court officials, and others subject to the judge's direction and control to do so. This section does not preclude the consideration of race, sex, religion, national origin, disability, age, sexual orientation, socioeconomic status, or other similar factors when they are issues in the proceeding.
[[Image here]]
(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person’s lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:
(a) Where circumstances require, ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits are authorized, provided:
(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.
(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice and affords the parties reasonable opportunity to respond.
(c) A judge may consult with other judges or with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities.
(d) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.
(e) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.
[[Image here]]
*1085 C. Administrative Responsibilities.
(1)A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.
[[Image here]]
Canon 4. A Judge is Encouraged to Engage in Activities to Improve the Law, the Legal System, and the Administration of Justice
A. A judge shall conduct all of the judge's quasi-judicial activities so that they do not:
(1)cast reasonable doubt on the judge’s capacity to act impartially as a judge;
(2) demean the judicial office; or
(3) interfere with the proper performance of judicial duties.
[[Image here]]
Canon 5. A Judge Shall Regulate Extrajudicial Activities to Minimize the Risk of Conflict with Judicial Duties
A. Extrajudicial Activities in General. A judge shall conduct all of the judge's extrajudicial activities so that they do not:
(1) cast reasonable doubt on the judge's capacity to act impartially as a judge;
(2) demean the judicial office; or
(3) interfere with the proper performance of judicial duties.
Fla.Code Jud. Conduct, Canons 1-5.

. The fourteen violations Judge Albritton admitted corresponded to charges 4, 5, 9, 11, 22, 24, 25, 26, 27, 29, 30, 31, 33, and 36 of the Amended Notice of Formal Charges.