h COOKS, Judge.
These consolidated appeals arise from a one vehicle accident which occurred on August 1, 1994, on U.S. Highway 190, near Port Barre, Louisiana. The plaintiffs are either passengers in the vehicle or the heirs, assigns or spouses of the passengers. All of the passengers were auditors for RGIS Inventory Specialists and were returning to Baton Rouge from Alexandria in a company van after completing a job.
During the early morning hours of July 31, 1994, four vans carrying RGIS employees departed from the Holiday Inn South in Baton Rouge, Louisiana en route to Alexandria. Their mission was to conduct an inventory of a Sears Department Store. Samuel Templeton, a RGIS employee, drove one of the company vans.
At approximately 7:30 a.m., the vans arrived at the Sears store. Although the auditors expected to complete the inventory by 6:00 p.m. that evening, they worked well into the night. At approximately 11:30 p.m., Dennis Burleigh, the manager for 12RGIS’ Baton Rouge District, instructed Templeton to gather the employees riding in his van, sign out and return to Baton Rouge. The van left the Sears store en route to Baton Rouge between 12:00 a.m. and 12:15 a.m.
At the time RGIS’ van departed, Tem-pleton had been awake well over 18 hours. He also worked long hours the previous day on another job for RGIS. Templeton testified, however, he was awake, alert and capable of safely driving to Baton Rouge. Kenneth Davis offered to drive part of the way if necessary, but Templeton stated he had a headache which would keep him awake. Dennis Burleigh testified he knew all the employees were tired, but had no doubt Templeton could drive safely back to Baton Rouge. No employee requested, instead, that RGIS pay for hotel accommodations in Alexandria.
The van traveled, for a distance, on Interstate 49 before it exited on U.S. 190 at Opelousas. Between five and ten minutes of the journey on U.S. 190, Templeton testified an animal ran out in front of the van, causing him to swerve and lose control of it. The van turned over three times, finally coming to rest on its side in the westbound lanes of travel. A number of passengers were ejected from the van during the accident. Many of the passengers were seriously injured, and Stephanie Johnson ultimately died from her injuries.
State Trooper Bernard Daigle was the first to arrive at the accident site. He interviewed Templeton, who told him a small animal ran into his lane and he swerved to avoid it. He also spoke to Kenneth Davis, who was riding in the front passenger’s seat. Davis told Trooper Dai-gle he saw a possum run in front of the van. Trooper Daigle cited Templeton for improper lane usage, a violation of La.R.S. 32:79. The Trooper testified Templeton said he was traveling 55 miles per hour at the time of the accident. The information the Trooper gathered at the scene did not indicate Templeton was speeding. At tri *68 al, however, several plaintiffs testified Templeton [3was traveling faster than 55 miles per hour. They also testified after the van departed the Sears store, Temple-ton engaged in “horseplay.” As examples, they allege he played with the radio, turned the van’s headlights on and off while moving, quickly changed lanes to cause the van to rock back and forth and carried on “mocking” conversations with passengers in the back of the van. They also testified Templeton had difficulty exiting the Sears parking lot. All the plaintiffs, however, admitted Templeton was not engaged in any of the alleged activities at the time of the accident.
Monica Schaefer, Alisha Ammous, Kevin Millender, Cobrey Bennet, Jason Chambers and Melanie Wade filed suit against defendants, Samuel Templeton, RGIS and National Union Fire Insurance Company (RGIS’ insurer), for the damages they sustained as a result of the accident. Lorita Johnson (the mother of Stephanie Johnson), filed suit individually and on behalf of the Estate of Stephanie Johnson, for damages against defendants. John Martin (the father of Stephanie Johnson), filed suit asking damages for the loss of Stephanie’s love and affection.
ACTION OF THE TRIAL COURT
The matter was tried before a jury which rendered a verdict in favor of the plaintiffs. The jurors found the auditors were not engaged in the course and scope of their employment with RGIS at the time of the accident and Templeton’s conduct constituted an intentional tort which was a cause in fact of the accident. The jury returned damage awards for the plaintiffs in the following amounts: The Estate of Stephanie Johnson was awarded $250,000 for the conscious pain and suffering experienced by Stephanie from the time of the accident to her death; Lorita Johnson was awarded $100,000 for the loss of Stephanie’s love and affection; Kevin Millender was awarded $150,000 in general damages, $88,000 in future medicals and $82,500 for loss of earnings (subject to a credit of $41,144.74 for workers’ compensation indemnity benefits previously paid); Monica Schaefer was awarded [4$150,000 in general damages and $3,000 in past loss of income (subject to a set-off of $1,955 against the past lost wage award for workers’ compensation indemnity benefits previously paid); Alisha Ammous was awarded $20,000 in general damages and $1,100 in past loss of income (subject to a set-off of $1,892.97 against the past lost wage award for workers’ compensation indemnity benefits previously paid); Jason Chambers was awarded $30,000 in general damages and $2,400 in past loss of income (subject to a set-off of $2,338.25 against the past lost wage award for workers’ compensation indemnity benefits previously paid); Melanie Wade was awarded $90,000 in general damages and $4,440 in past loss of income (subject to a credit of $4,164 as a result of workers’ compensation indemnity benefits previously paid); Cobrey Bennet was awarded $150,000 in general damages,, $2,000 in future medicals and $7,670 in past loss of income (subject to a credit of $6,395.12 as a result of workers’ compensation indemnity benefits previously paid). The claim of John Martin for damages for the loss of Stephanie’s love and affection was dismissed.
Defendants appeal the verdict rendered by the jury, asserting the following assignments of error:
1. The District Court improperly instructed the jury regarding the issue of course and scope of employment.
2. The jury was manifestly erroneous in finding that the Plaintiffs were not in the course and scope of their employment at the time of the accident.
3. The jury was manifestly erroneous in finding the one-car motor vehicle accident constituted an intentional tort.
4. The District Court erred in instructing the jury regarding the Sudden Emergency Doctrine.
*69 5. The jury was manifestly erroneous in not applying the Sudden Emergency Doctrine and exonerating defendants.
6. The jury was manifestly erroneous in the damages awarded to several of the Plaintiffs.
LPlaintiffs have answered the appeal, contending the amount of damages awarded was inadequate. John Martin asserted the jury erred in not rendering an award to him for the loss of his daughter’s love and affection
STANDARD OF REVIEW
Findings of fact by a jury are reviewed under the manifest error or clearly wrong standard. O’Neill v. Thibodeaux, 97-1065 (La.App. 3 Cir. 3/6/98); 709 So.2d 962, units denied, 98-741 (La.5/1/98); 718 So.2d 416 and 98-870 (La.5/1/98); 718 So.2d 420. Before the factfinder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Dev., 94-2370 (La.4/21/95), 654 So.2d 311; Stobart v. State through Dept. of Transp. and. Dev., 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the factfinder’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dep’t Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216.
COURSE AND SCOPE OF EMPLOYMENT
Defendants submit the employees in the van were all engaged in the course and scope of their employment with RGIS at the time of the accident, and therefore, the exclusive remedy provision of the Workers’ Compensation Act bars the present action for general tort recovery. Defendants contend the verdict was prompted by an incorrect jury instruction and the jury’s erroneous application of Louisiana law. Because we agree the established facts in this case confirm the auditors were engaged in the course and SC0Pe of their employment at the time of the accident and Templetons conduct was not inten-tiona1’ the ^ 1(3^ erred in fíndinS the Jj£°ntrary. We pretermit addressing defendants’ assignment alleging the jury was instructed improperly.

A. Relevant Undisputed Facts.

RGIS’ Baton Rouge office was contacted by Sears and requested to perform an inventory of its Alexandria store on July 31, 1994. In response, RGIS provided four company vans to transport its employees to Alexandria. The employees met at a local site in Baton Rouge (the Holiday Inn-South) where they boarded the vans and departed for Alexandria. The testimony revealed RGIS’ practice was to provide transportation for its employees when they were required to perform work out-of-town. The RGIS Auditor’s Handbook provided in material part:
TRAVEL — On occasion you will be required to travel out of town for inventories. The need arises when our remote teams (or “out teams”) need assistance, or a neighboring district cannot accommodate a client’s request within a certain time frame. When traveling to remote inventories, we normally provide transportation from local meeting sites. However, we often need assistance in transporting large groups; any employee who agrees to be a driver in this situation, using his or her own vehicle, will be compensated for round-trip total miles from the meeting spot to the inventory and back.
If the company transportation proved inadequate, employees usually were asked to volunteer to transport employees in their personal vehicle. Employees were also, on occasions, allowed to use their own vehi- *70 cíes to travel to job sites. The RGIS Auditor’s Handbook also provided for payment of expenses for traveling to out-of-town inventories:
TRAVEL PAY — When riding in a company or designated vehicle to an out of town inventory, you will be compensated for the round trip miles traveled minus the first twenty miles. Travel pay is not paid for Local Stores. Currently the travel rate is_[1]
There is no dispute the employees involved in this accident were paid $0.08 per mile l7in travel pay, less the first twenty miles traveled.

B. Applicable Legal Principles.

The Louisiana Supreme Court in Orgeron v. McDonald, 93-1353 (La.7/5/94); 639 So.2d 224, 226-27, instructed:
Whether an employee is within the course and scope of his employment is a question that is only answerable by general rules, because of the unending contexts in which the question may arise. Generally speaking, an employee’s conduct is within the course and scope of his employment if the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer. W. Page Keeton et al., supra. ■
An employer is responsible for the negligent acts of its employee when the conduct is so closely connected in time, place, and causation to the employment duties of the employee that it constitutes a risk of harm attributable to the employer’s business. LeBrane v. Lewis, 292 So.2d 216 (La.1974). In determining whether the employee’s conduct is employment-rooted, the court assesses several factors, including the payment of wages by the employer, the employer’s power of control, the employee’s duty to perform the particular act, the time place and purpose of the act in relation to service of the employer, the relationship between the employee’s act and the employer’s business, the benefits received by the employer from the act, the motivation of the employee for performing the act, and the reasonable expectation of the employer that the employee would perform the act. Reed v. House of Decor, Inc., 468 So.2d 1159 (La.1985).
The present case involves the application of the principle that an employee who is traveling from home to work or returning from work to home is generally not within the course and scope of his employment. Because an employee usually does not begin work until he reaches his employer’s premises, his going to and coming from work is generally considered outside the course of his employment unless he has a duty to perform en route. Moreover, an employee’s place of residence is a personal decision not directly controlled by the employer, and treating commuting time as part of the determination of course and scope of employment would remove manageable boundaries from the determination.
The going and coming rule applies nicely when the employee has a fixed place of work, so that his traveling back and forth between his home and his fixed place of work is almost never in the course of employment. Not all employees, however, work on the employer’s premises or have a fixed place of work. The dispatching of employees to different work locations gives rise to many “shades of gray” in the otherwise “black and white” applications of the going and coming rule. |8When an employee is required to check in at a certain place and is then dispatched to the work site for that day, he is generally in the course of employment in the travel between the check in place and the work *71 site, but not between home and the check in place. See generally Arthur Larson, Lato of Workman’s Compensation § 16 (1993). However, when an. employee is instructed to report to different work sites which change periodically, without first reporting to a check in place, there are more variations in the determination of course and scope of employment.
This court in Bergeron v. MarCon, Inc., 97-263 (La.App. 3 Cir. 11/26/97); 705 So.2d 232, unit denied, 98-806 (La.5/8/98); 719 So.2d 52, following Orgeron, held as a general rule an employee involved in an accident while traveling to and from work is not acting within the course and scope of his employment and is therefore not entitled to workers’ compensation benefits. However, we also cited Orgeron’s exception that an employee, required to check in at a certain place and then dispatched to the work site, generally is engaged in the course of employment while traveling between the check in place and the work site, but not between home and the check in place. The RGIS employees in this case were required to meet at a check-in site, the Holiday Inn South in Baton Rouge, before departing for Alexandria. Applying the holdings in Orgeron and Bergeron, RGIS’ auditors were engaged in the course and scope of their employment.
Nonetheless, plaintiffs argue because RGIS did not require the employees to ride in company provided transportation and pay them them regular wages while traveling, the holdings in the noted cases should not apply here. The facts undeniably indicate RGIS interested itself in the transportation of its employees by providing a vehicle, driver and paying travel expenses to its employees. It is well settled jurisprudence where transportation is furnished as an incident of employment, either through a vehicle or payment of expenses, and where wages are paid for the time spent traveling, the employee is engaged in the course and scope of employment. Michaleski v. Western Preferred Cas. Co., 472 So.2d 18 (La.1985); Hill v. West American Ins. Co., 93-915 (La.App. 3 Cir. 3/2/94); 635 So.2d 1165; Castille v. Sibille, 342 So.2d 279 (LaApp. 3 Cir.1977); Keith v. Gelco Corp., 30,022 (La.App. 2 Cir. 12/10/97); 705 So.2d 244; Brown v. Coastal Constr. & Eng’g, Inc., 96-2705 (La.App. 1 Cir. 11/7/97); 704 So.2d 8; Hebert v. Jeffrey, 94-1230 (La.App. 1 Cir. 4/7/95); 653 So.2d 842.
RGIS’ common practice was to provide its employees transportation to and from out-of-town inventories. Dennis Burleigh testified this was done to ensure the proper number of auditors arrived on time at the inventory site. No employee was ever required to take their own vehicle to an out-of-town inventory. RGIS also paid each employee $0.08 per mile, less the first twenty miles, for riding to the inventory site.
Still plaintiffs contend the transportation was provided as a courtesy or gratuity, and is similar to the decision in Hebert, 653 So.2d 842. In Hebert, the court found, in the normal course of work, the employer required its employees to provide their own transportation to work and did not furnish travel expenses to its employees. The court also found the employee gratuitously offered to drive other employees to a job site, the offer was unplanned, the employer did not require the offer, and it paid no expenses for travel time. In the present ease, the transportation provided by RGIS was not an occasional accommodation or gratuity. RGIS arranged, in advance, for the transportation needed by its employees to travel out-of-town and paid their travel expenses.
Plaintiffs also argue the $0.08 per mile RGIS paid its employees was in the nature of an -inducement to attract qualified personnel and was, in reality, a salary supplement as this court found in Mitchell v. Pleasant Hill Gen. Hosp., Inc., 491 So.2d 183 (La.App. 3 Cir.), unit denied, 493 So.2d 1223 (La.1986). We held in Mitchell the employee was not engaged in the course and scope of employment | inbecause *72 her travel allowance of $8.00 per day was a salary supplement and not paid in lieu of the company providing transportation for her. However, the Mitchell panel noted the employer never intended nor attempted to furnish transportation for the employee. The court stated:
The mere payments of travel expenses, without an expressed or implied agreement to furnish transportation, does not place the employee within the course and scope of his employment while traveling to and from work if such payments bear no relation to the actual travel expenses involved in the specific case, and are intended only as an inducement to attract qualified personnel at a particular job site.
Id. at 185.
Mitchell is distinguishable from the present case. Here, the employees were only provided with the $0.08 per mile travel pay if they actually traveled to an inventory. In Mitchell, the employee’s $8.00 per day pay was not dependent on whether the travel actually occurred.
Finally, plaintiffs suggest the course and scope of employment issue presents a policy question. They argue a duality of purpose underscores the course and scope inquiry which requires different application depending on whether the employee grounds his or her claim on the workers’ compensation provisions or general tort law. Specifically, they contend our workers’ compensation system was enacted to protect the injured workers; and this social purpose, thus, often motivates the triers to find employees are engaged in the course and scope of employment in workers’ compensation proceedings. Conversely, they argue, no social purpose is served by arriving at the same conclusion in tort cases. During oral argument, plaintiffs conceded if we were addressing entitlement to recover under the Workers’ Compensation Act, little doubt would exist that the auditors were engaged in the course and scope of their employment with RGIS at the time of the accident. But in the present tort context, though the question remains the same, they suggest we _jiJshould answer it differently and find the auditors were not so engaged. Plaintiffs’ argument is creative, but contrary to settled jurisprudence; and we simply cannot adopt it. The jury legally erred in finding the employees traveling in the RGIS van were not engaged in the course and scope of their employment at the time of the accident.
INTENTIONAL TORT
Our decision on the course and scope issue does not necessarily defeat plaintiffs’ tort claims. They may still recover if the defendants committed an intentional act. The jury found defendants’ conduct constituted an intentional tort. Defendants argue the jury erred in this finding as well.
In Reeves v. Structural Preservation Sys., 98-1795 (La.3/12/99); 781 So.2d 208, the Louisiana Supreme Court considered the question of whether an employer’s conduct fell within the ambit of the intentional act exception found in the Workers’ Compensation Act. In that case, the employee was instructed by his foreman to move a sandblasting pot which weighed approximately 350 to 400 pounds empty. The pot had warning stickers on it, required by OSHA, which read “DO NOT MOVE MANUALLY.” All parties conceded the proper way to move the pot was to affix it to a pallet and move it with a forklift or heister. At previous job sites, the pot was moved by a forklift. However, the employer decided on this occasion that a forklift or heister was not necessary to remove the pot from the pallet. The foreman twice asked “upper management” for a tow motor or forklift to move the metal pot, but the requested equipment was never supplied. The foreman testified because he feared someone would eventually get hurt moving the pot manually, he sometimes moved the pot manually himself. While attempting to move the pot, it fell on an employee crushing his knee and injuring his back. A divided panel of this court *73 affirmed a jury verdict finding an intentional tort had been committed. Reeves v. Structural Preservation Sys., 97-1465 (La.App. 3 Cir. 6/3/98); 716 So.2d 58. The Supreme Court granted a writ to consider the correctness of that ruling. Reeves v. Structural Preservation Sys., 98-1795 (La.10/30/98); 723 So.2d 966.
The Supreme Court examined the history of the Workers’ Compensation Act. In 1976, the legislature amended the Act to provide that workers’ compensation shall be the exclusive remedy against the employer when the employee is engaged in the normal course and scope of his employment, except in circumstances where injury results from an intentional act. As amended in 1976, La.R.S. 23:1032(B) reads:
Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
The court discussing the meaning of “intent” in the context of the amended statute, reiterated that the employer or other person identified in the Act must “either (1) consciously desire the physical result of his act, whatever the likelihood of the result happening from his conduct, or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result.” Reeves, 731 So.2d at 211, citing Bazley v. Tortorich, 397 So.2d 475, 481 (La.1981). Since Bazley, the Supreme Court cautioned that it and the appellate courts have narrowly construed the intentional act exception according to legislative intent. Id. Although OSHA guidelines prohibited manual movement of the sandblasting pot and the supervisor had requested a forklift, those facts still were deemed insufficient by the Supreme Court to establish an intentional tort.
We are unable to determine in this case exactly what conduct, by what defendant, the jury found constituted an intentional tort. At trial, plaintiffs alleged two intentional acts were committed by defendants. First, they asserted Samuel Templeton was engaged in “horseplay” which he should have known was | -^substantially certain to cause an accident. Second, they argued RGIS supervisory personnel, in particular Dennis Burleigh, should have known Templeton was too tired from his long hours of work to drive the van. They suggest Burleigh should have offered hotel accommodations for the workers or allowed them to leave for Baton Rouge earlier. The record clearly shows neither Templeton nor Burleigh intended this accident to occur. Thus, the first portion of the Bazley test does not apply to this matter. The question is whether defendants knew the accident was “substantially certain” to follow from their conduct.

I. Horseplay by Samuel Templeton.

Plaintiffs presented the testimony of a number of passengers in the van, who testified regarding the alleged “horseplay” engaged in by Templeton. Monica Schae-fer, an employee riding in the van, stated Templeton had the radio volume turned up so loud pillows were placed over the speakers. She remembered many of the passengers complained to Templeton about the volume, and asked him to change the station. When the van was approaching Port Barre, Schaefer (seated in the rear) recalled she heard Templeton comment that there were no street lights and saw him turn the van headlights off. Ms. Schaefer thought Templeton was playing with the passengers when he turned the headlights off, noting “we got upset with him, you know, we hollered at him that we wanted him to leave them on. We told him you know, to stop playing.” Ms. Schaefer thought the lights were turned off for “more than just a flicker.” Although she admitted not knowing how much time elapsed between Templeton turning the headlights off and the actual accident. But she felt it was “just a short *74 time.” She was positive the van’s headlights were on at the time of the accident; and that the only swerving of the van which occurred that night happened during the accident.
Kevin Millender, who was seated behind the driver’s seat, testified Templeton | ]4had a problem exiting the Sears’ parking lot. He thought Templeton was “playing around” in the parking lot. Millender confirmed the radio was “extremely loud,” and related Templeton turned around to address some of the passengers who were complaining about the radio. He testified Templeton turned the van’s headlights off for about four or five seconds, and three to five minutes elapsed between turning the lights off and the accident. However, in a prior sworn statement, Millender stated the time difference between incidents was fifteen to twenty minutes. Millender testified Templeton swerved from lane to lane on at least two separate occasions. The first was one when he turned around to talk to the passengers in the back; and the second when he turned the lights on and off. He admitted the lights were on immediately prior to the accident. Millender also testified he looked at the speedometer on occasion, and Templeton was traveling between 75 to 80 miles per hour; but he did not tell Templeton to slow down, because “everyone else” was telling him to slow down. Just before the accident, Mil-lender said it appeared to him Templeton had fallen asleep, but he could not be sure because he could not see Templeton’s face. Millender also stated he was looking at the road and did not see an animal cross in front of the van.
Cobrey Gerard Bennet, seated in the first bench row in the middle next to Kevin Millender, testified Templeton turned the lights of the van on and off on at least two occasions. He said the lights were off long enough for “people to notice.” He also stated Templeton changed lanes at least two times for no apparent reason. Bennett testified he looked at the speedometer about five or ten minutes before the accident, and the van was traveling 70 and 75 miles per hour. He too did not see any animal appear in front of the van.
Kenneth Davis, who rode .in the front passenger seat, testified Templeton had trouble exiting the Sears’ parking lot. Davis noted the parking lot was dark, and did |1finot think Templeton was driving erratically. He noted, however, Templeton may have been driving too fast in the parking lot. Davis stated he asked Tem-pleton if he wanted him to drive, but Tem-pleton told him he had a headache that would keep him awake. Davis testified Templeton cut the headlights off and back on to get the attention of the other passengers because it was getting quiet. According to Davis, this occurred approximately thirty minutes into the trip on Highway 190, not Interstate 49. Davis said this was the only time Templeton turned the headlights off. Davis also stated Templeton made a swerving motion to the left and right in an attempt to rock the van. According to Davis, this was done while on Highway 190, about ten minutes prior to turning the lights on and off. He testified at one point while traveling on Highway 190, Templeton was traveling approximately 85 miles per hour. Davis admitted he could not see the numbers on the speedometer, but stated the speedometer needle was “straight across.” Davis detailed the events of the accident as follows:
At the time of the accident, I was sitting watching the road. I saw a possum come out in front of us. I stuck my right leg out onto the wheelwell inside the van as if I had my foot resting there. I kind of tightened up my leg expecting to feel a thump like whenever you run over an animal.
Sam jerked the wheel real hard to the left and hollered quote, What the hell was that, unquote.
He jerked it back to the right again. And after the first jerk, we were out of control; and on the third swerve, I could feel us going over.
*75 Davis stated the van’s headlights were on at the time of the accident. He also testified Templeton’s turning the headlights on and off and swerving to rock the van did not cause the accident.
Samuel Templeton admitted he was fatigued after the “long hours” he worked. He stated he was in a “euphoric nature at the time” because the job was completed; but felt he was “okay” to drive so he refused Kenneth Davis’ offer to drive part of the way. He admitted having difficulty exiting the parking lot, noting he could not find bathe exit right away. He explained there were no lights on in the parking lot; and he did not remember where the exit was because he had entered it during daylight. Templeton stated about fifteen minutes outside of Alexandria he flicked his lights on and off to indicate to a vehicle traveling in the other direction that he did not have his high beams on. According to Templeton this was the only time he flicked the exterior lights off. But Tem-pleton recalled turning on the interior lights to locate his briefcase. Templeton stated he did not fall asleep and had no problem with his perception or alertness. He testified a few minutes after turning onto Hwy. 190, an animal ran out in front of the van and he swerved to avoid it, losing control of the vehicle. Templeton stated a large animal ran onto the road, which he thought was a deer. However, according to State Trooper Daigle, Tem-pleton told him a small animal ran onto the road.
Numerous inconsistencies in the various witnesses’ testimony exist concerning the alleged incidents of “horseplay” committed by Templeton. Even if we accept all the witnesses’ testimony as true, the evidence as a whole falls short of establishing Samuel Templeton intentionally caused the accident or knew it was substantially certain to occur. No witnesses testified Temple-ton was engaged in any acts of “horseplay” at the time of the accident. At most, Kevin Millender testified Templeton may have fallen asleep immediately prior to swerving the van and losing control of it. The jury’s finding to the contrary was manifestly erroneous.

II. Intentional Act by RGIS.

Plaintiffs also argue RGIS committed an intentional tort in the following particulars: (1) by allowing an obviously fatigued Templeton to drive its van back to Baton Rouge, (2) by allowing Templeton to drive home, rather than getting a different driver, or (3) by not arranging for hotel rooms in Alexandria, or dismissing the workers earlier from the job. We disagree. Dennis Burleigh stated if he had any 117question as to Templeton’s ability to drive, he would have found a different driver or arranged for hotel rooms. No employee asked Burleigh to provide hotel rooms in Alexandria, nor did anyone voice any concerns to Burleigh about Templeton driving home.
“Substantial certainty” requires more than a reasonable probability that an injury will occur. The injury must be inevitable; the injury causing event must be incapable of failing. Reeves, 731 So.2d at 208; Jasmin v. HNV Central Riverfront Corp., 94-1497 (La.App. 4 Cir. 8/30/94); 642 So.2d 311, writ denied, 94-2445 (La. 12/9/94); 647 So.2d 1110. No evidence exists to support a finding that the accident was substantially certain to occur because of Templeton’s fatigue. Further, RGIS’ failure to have a policy regarding driver fatigue does not rise to the level of an intentional tort. Such a failure, at most, constitutes a failure to provide a safe place to work and “could [have been] said to have made the occurrence’ of an accident likely,” Dycus v. Martin Marietta Corp., 568 So.2d 592, 594 (La.App. 4 Cir.1990), quoting. Hood v. South Louisiana Medical Center, 517 So.2d 469, 471 (La.App. 1 Cir.1987), but falls short of establishing the inevitable or “substantially certain” act needed to prove an intentional tort. As the Supreme Court said in Reeves, 731 So.2d at 212:
*76 Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers’ compensation.
The intentional act exclusion must be narrowly construed. Even if RGIS was reckless, or grossly negligent in allowing Tem-pleton to drive while fatigued, its conduct still did not rise to the level of an intentional tort. The jury’s finding to the contrary was clearly wrong.
Having found plaintiffs were engaged in the course and scope of their | ^employment and that defendants’ conduct, albeit negligent, was not an intentional tort, we must reverse the lower court judgment and dismiss plaintiffs’ petition for damages. Defendants remaining assignments of error and the plaintiffs’ arguments concerning quantum are rendered moot.
DECREE
For the foregoing reasons, the judgment of the lower court is reversed and the plaintiffs’ petitions for damages are dismissed at their cost.
REVERSED.

. There is no dispute the travel pay rate was $0.08 per mile at the time of the accident. Employees, who requested to use their own vehicles, were paid $0.21 per mile in travel expenses in addition to the $0.08 per mile travel pay.